PARKER, Justice.
Hope Elisabeth Ankrom and Amanda Helaine Borden Kimbrough (“the petition *401 ers”) each petitioned this Court for a writ of certiorari to review the Court of Criminal Appeals’ decisions in their cases. We granted the petitions and consolidated these cases, each of which presents the same issue of first impression for this Court’s consideration: Whether the term “child” as used in § 26-15-3.2, Ala.Code 1975 (“the chemical-endangerment statute”), includes an unborn child. Concluding that it does and that the Court of Criminal Appeals reached the correct decision in both cases, we affirm the judgments of the Court of Criminal Appeals.

I. Facts and Procedural History

The Court of Criminal Appeals recounted the facts of Ankrom’s ease as follows in its opinion:
“At the guilty-plea hearing, the parties stipulated to the following facts:
“ ‘On January 81, 2009, the defendant, Hope Ankrom, gave birth to a son, [B.W.], at Medical Center Enterprise. Medical records showed that [Ankrom] tested positive for cocaine prior to giving birth and that the child tested positive for cocaine after birth.
“ ‘Department of Human Resources worker Ashley Arnold became involved and developed a plan for the care of the child. During the investigation [Ankrom] admitted to Ashley that she had used marijuana while she was pregnant but denied using cocaine.
“ ‘Medical records from her doctor show that he documented a substance abuse problem several times during her pregnancy and she had tested positive for cocaine and marijuana on more than one occasion during her pregnancy.’
“On February 18, 2009, Ankrom was arrested and charged with chemical endangerment of a child. On August 25, 2009, the grand jury indicted Ankrom. The indictment stated that Ankrom ‘did knowingly, recklessly, or intentionally cause or permit a child, to-wit: [B.W.], a better description of which is to the Grand Jury otherwise unknown, to be exposed to, to ingest or inhale, or to have contact with a controlled substance, chemical substance, or drug paraphernalia as defined in Section 13A-12-260 of the Code of Alabama, 1975, to-wit: Cocaine, in violation of Section [26 — 15— 3.2(a)(1)].’
“On September 25, 2009, Ankrom filed a motion styled as a ‘Motion to Dismiss Indictment.’ In that motion, after setting forth the facts, Ankrom argued that ‘[t]he plain language of [§ 26-15-3.2, Ala.Code 1975,] shows that the legislature intended for the statute to apply only to a child, not a fetus’; that ‘courts in other states which have enacted the same or similar chemical endangerment statutes have determined that such statutes do not apply to prenatal conduct that allegedly harms a fetus’; that ‘[t]he state’s contention that the defendant violated this statute renders the law imper-missibly vague, and therefore the rule of lenity applies’; that ‘[t]he legislature has previously considered amending the statute to include prenatal conduct that harms a fetus, and declined to do so’; that ‘the defendant has not been accorded due process because there was no notice that her conduct was illegal under this statute’; that ‘[t]he prosecution of pregnant women is a violation of the constitutional guarantee of Equal Protection’; and that ‘[p]rosecution of pregnant, allegedly drug-addicted women is against public policy for numerous moral and ethical reasons.’ The State responded to that motion on October 13, 2009. In the State’s response, it agreed that on January 31, 2009, Ankrom gave birth to a son and that medical records *402 showed that Ankrom tested positive for cocaine immediately prior to giving birth and that the child tested positive for cocaine after birth. Based on that conduct, the State argued that prosecution of Ankrom was proper under § 26-15-8.2, Ala.Code 1975. On October 15, 2009, the trial court denied Ankrom’s motion.
“On April 1, 2010, Ankrom pleaded guilty to a violation of § 26-15-3.2(a)(l), Ala. Code 1975.”
Ankrom v. State, 152 So.3d 373, 375-76 (Ala.Crim.App.2011). Ankrom was sentenced to three years in prison, but her sentence was suspended and she was placed on probation for one year. Ankrom, 152 So.3d at 375.
In its unpublished memorandum in Kimbrough v. State, 114 So.3d 163 (Ala.Crim.App.2011) (table), the Court of Criminal Appeals recounted the facts of Kim-brough’s case as follows:
“In September 2008, Amanda Helaine Borden Kimbrough was indicted for the chemical endangerment of a child that resulted in death, a violation of § 26-15-3.2(a)(3), Ala.Code 1975. The indictment stated:
“ ‘The grand jury of said county charge that, before the finding of the indictment, Amanda Helaine Borden Kimbrough, whose name is otherwise unknown to the Grand Jury than as stated, ... did knowingly, recklessly, or intentionally cause or permit a child, Timmy Wayne Kimbrough, to be exposed to, to ingest or inhale, or to have contact with a controlled substance, to wit: methamphetamine, and the exposure, ingestion, inhalation, or contact resulted in the death of Timmy Wayne Kimbrough, in violation of [§] 26-15-3.2 of the Code of Alabama [1975], against the peace and dignity of the State of Alabama.’
“Kimbrough, through retained counsel, filed several pretrial motions, including four motions to dismiss the indictment. In her motions to dismiss, Kimbrough alleged: (1) that the term ‘child’ in § 26-15-3.2 did not include an unborn child, and therefore, her conduct in smoking methamphetamine while pregnant did not constitute the offense of the chemical endangerment of a child; (2) that prosecuting her for violating § 26-15-3.2 for conduct that occurred during her pregnancy when, she says, that conduct did not constitute the offense of chemical endangerment of a child, violated the doctrine of separation of powers; (3) that interpreting the term ‘child’ in § 26-15-3.2 to include an unborn child rendered the statute void for vagueness and violated her due-process right to notice that her conduct was proscribed; and (4) that interpreting the term ‘child’ in § 26-15-3.2 to include an unborn child violated her right to equal protection under the law. The trial court denied the motions without comment.
“Kimbrough initially proceeded to trial; however, after the trial court denied her motion for a judgment of acquittal at the close of the State’s case, Kimbrough reached a plea agreement with the State, and the jury was dismissed. Pursuant to the plea agreement, Kimbrough pleaded guilty to the chemical endangerment of a child as charged in the indictment, and the trial court sentenced her to 10 years’ imprisonment.
“Before entering her guilty plea, Kim-brough’s counsel expressly reserved Kimbrough’s right to appeal several issues, namely:
“ ‘Colbert County being improper venue and improper jurisdiction.
*403 “‘The constitutional issue with an unborn child is not covered by [§ 26-15-3.2, Ala.Code 1975].
“ ‘The denial of indigency status on her behalf for the purposes of expert witnesses. The plain language of this statute shows that the legislature intended the statute to apply only to a child and not an unborn child. This statute is vague and impermissibly vague. And the legislature has declined to pass a statute that would include an unborn child in this type of situation. And that [Kimbrough] has not been afforded due process because there was no notice to her that the conduct was illegal under the statute.
“ ‘The prosecution of pregnant women is a violation of the constitution [sic] of the guaranty of equal protection. And the prosecution of a pregnant addicted woman is against public policy for ethical and morale [sic] reasons. And [Kimbrough] is not a responsible] person as defined under the statute.
“ ‘And anything else I objected to.’ “The record reflects the following facts. Shortly before 10 a.m. on April 29, 2008, Kimbrough was admitted to the Helen Keller Hospital in Colbert County experiencing labor pains. She was 25 weeks and 5 days pregnant at the time. Her obstetrician, Dr. F.C. Gapultos, Jr., diagnosed her with preterm labor and ‘occult cord prolapse,’ a condition in which the umbilical cord descends through the birth canal before the fetus, resulting in the blood flow through the umbilical cord being cut off. Dr. Gapultos also ordered a urine drug screen on Kimbrough, which came back positive for methamphetamine. Both Dr. Gapultos and the biological father of Kimbrough’s unborn child confronted her about using methamphetamine while pregnant, but Kimbrough denied using methamphetamine while she was pregnant.
“A Caesarian section was performed on Kimbrough and, at approximately 1:21 p.m., she delivered a baby boy she named Timmy Wayne Kimbrough (‘Timmy’). Timmy was not breathing when he was born; he was blue; and his heart rate was low for a newborn infant, approximately 80 beats per minute. Pediatric staff who were present during the Caesarian section immediately began manual resuscitation efforts on Timmy. Initially, Timmy improved, with his heart rate rising above 100 beats per minute and his' color becoming more pinkish. Timmy was intubated and placed on a ventilator. However, after the intubation, Timmy’s condition declined rapidly and he died at 1:40 p.m., 19 minutes after he was born.
“The pediatrician who treated Timmy opined that he had died from ‘respiratory arrest secondary to prematurity.’ However, Dr. Emily Ward, a medical examiner with the Alabama Department of Forensic Sciences who performed an autopsy on Timmy, determined that Timmy had died from ‘acute methamphetamine intoxication.’ A toxicology screen conducted on Timmy’s blood and a sample of his liver tissue showed that he had both methamphetamine and amphetamine, a ‘metabolite of methamphetamine’ produced when the body ‘converts’ the methamphetamine into amphetamine, in his system.
“The Colbert County Department of Human Resources (‘DHR’) was notified regarding Kimbrough’s testing positive for methamphetamine and Timmy’s death, and Kimbrough’s other two children were temporarily removed from her home and placed with Kimbrough’s mother. A DHR social worker spoke *404 with Kimbrough regarding a safety plan for her children on two occasions. During one of those conversations, Kim-brough admitted that she had smoked methamphetamine with a friend three days before she had experienced labor pains. In July 2008, after having determined that the children would be safe in Kimbrough’s home, DHR returned Kim-brough’s children to her custody.”
Kimbrough was sentenced to 10 years in prison and appealed her conviction and sentence before her scheduled probation hearing could be held; however the record indicates that she has remained free on bond during her appeal.
Ankrom and Kimbrough appealed their convictions to the Court of Criminal Appeals. In its opinion in Ankrom, that court held that the word “child” in the chemical-endangerment statute included an unborn child:
“Ankrom alleges that the term ‘child’ in § 26-15-3.2, Ala.Code 1975, does not include a viable fetus. The State responds that the plain meaning of the term ‘child,’ as used in the statute, includes an unborn child.
“ ‘Principles of statutory construction instruct this Court to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.’ Ex parte Pratt, 815 So.2d 532, 535 (Ala.2001). ‘[T]he fundamental rule [is] that criminal statutes are construed strictly against the State.’ Ex parte Hyde, 778 So.2d 237, 239 n. 2 (Ala.2000). ‘The “rule of lenity requires that ‘ambiguous criminal statute[s] ... be construed in favor of the accused.’ ” ’ Ex parte Bertram, 884 So.2d 889, 892 (Ala.2003) (quoting Castillo v. United States, 530 U.S. 120, 131, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000)).
“ ‘Although penal statutes are to be strictly construed, courts are not required to abandon common sense. United States v. Green, 446 F.2d 1169, 1173 (5th Cir.1971). Absent any indication to the contrary, the words must be given their ordinary and normal meaning. Day v. State, 378 So.2d 1156, 1158 (Ala.Cr.App.), reversed on other grounds, 378 So.2d 1159 (Ala.1979).’
“Walker v. State, 428 So.2d 139, 141 (Ala.Crim.App.1982).
“The legislature has stated that ‘[t]he public policy of the State of Alabama is to protect life, born, and unborn. This is particularly true concerning unborn life that is capable of living outside the womb.’ § 26-22-l(a), Ala.Code 1975. Chapter 15 of Title 26, Ala.Code 1975, does not define, the term ‘child.’ However, Chapters 14 and 16 of Title 26, Ala. Code 1975, define a ‘child’ as a ‘person’ under the age of 18 years. § 26-14-1(3), Ala.Code 1975; § 26-16-2(1), Ala.Code 1975.
“Also, the Alabama Supreme Court has interpreted the term ‘minor child’ in Alabama’s wrongful-death-of-minor statute to include a viable fetus that received prenatal injuries causing death before a live birth. Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974). Specifically, the Court held that ‘the parents of an eight and one-half month old stillborn fetus [are] entitled to maintain an action for the wrongful death of the child’; thus, the Court explicitly recognized the viable fetus as a ‘child.’ Eich, 293 Ala. at 100, 300 So.2d at 358.
“Furthermore, the dictionary definition of a word provides the meaning ordinary people would give the word. Carpet Installation & Supplies of Glenco v. Alfa Mut. Ins. Co., 628 So.2d 560, *405 562 (Ala.1993). According to Merriam-Webster’s Collegiate Dictionary 214 (llth ed. 2003), the word ‘child’ is defined as ‘an unborn or recently born person.’ The word ‘child’ is defined in Black’s Law Dictionary 254 (8th ed. 2004), as ‘[a] baby or fetus.’
“The present case is similar to the situation in Whitner v. State, 328 S.C. 1, 492 S.E.2d 777 (1997). We find the reasoning of the South Carolina Supreme Court in that case to be persuasive.
“In Whitner, a mother pleaded guilty to criminal child neglect, a violation of S.C.Code Ann. § 20-7-50 (1985), for causing her baby to be born with cocaine metabolites in its system by reason of the mother’s ingestion of crack cocaine during the third trimester of her pregnancy. On appeal, the South Carolina Supreme Court held that the mother had been properly convicted of the charge. S.C.Code Ann. § 20-7-50 (1985), provided in relevant part: ‘Any person having the legal custody of any child ..., who shall, without lawful excuse, refuse or neglect to provide ... the proper care and attention for such child ..., so that the life, health or comfort of such child ... is endangered or is likely to be endangered, shall be guilty of a misdemeanor and shall be punished within the discretion of the circuit court.’ Whitner, 328 S.C. at 5, 492 S.E.2d at 779. The issue on appeal was whether that statute encompassed maternal acts that endanger or were likely to endanger the life, health, or comfort of a viable fetus. Id. The Court stated that
“ ‘[u]nder [South Carolina’s] Children’s Code, “child” means a “person under the age of eighteen.” S.C.Code Ann. § 20-7-30(1) (1985). The question for this Court, therefore, is whether a viable fetus is a “person” for purposes of the Children’s Code.’
“328 S.C. at 6, 492 S.E.2d at 779.
“The South Carolina Supreme Court held that a viable fetus is a child under S.C.Code Ann. § 20-7-50 (1985), reasoning:
“ ‘South Carolina law has long recognized that viable fetuses are persons holding certain legal rights and privileges. In 1960, this Court decided Hall v. Murphy, 236 S.C. 257, 113 S.E.2d 790 (1960). That case concerned the application of South Carolina’s wrongful death statute to an infant who died four hours after her birth as a result of injuries sustained prenatally during viability. The Appellants argued that a viable fetus was not a person within the purview of the wrongful death statute, because, inter alia, a fetus is thought to have no separate being apart from the mother.
“ “We found such a reason for exclusion from recovery “unsound, illogical and unjust,” and concluded there was “no medical or other basis” for the “assumed identity” of mother and viable unborn child. Id. at 262, 113 S.E.2d at 793. In light of that conclusion, this Court unanimously held: “We have no difficulty in concluding that a fetus having reached that period of prenatal maturity where it is capable of independent life apart from its mother is a person.” Id. at 263, 113 S.E.2d at 793 (emphasis added).
“‘Four years later, in Fowler v. Woodward, 244 S.C. 608, 138 S.E.2d 42 (1964), we interpreted Hall as supporting a finding that a viable fetus injured while still in the womb need not be born alive for another to maintain an action for the wrongful death of the fetus.
“ ‘ “Since a viable child is a person before separation from the body *406 of its mother and since prenatal injuries tortiously inflicted on such a child are actionable, it is apparent that the complaint alleges such an ‘act, neglect or default’ by the defendant, to the injury of the child....
“[1] “Once the concept of the unborn, viable child as a person is accepted, we have no difficulty in holding that a cause of action for tortious injury to such a child arises immediately upon the infliction of the injury.”
“ ‘Id. at 613, 138 S.E.2d at 44 (emphasis added). Fowler makes particularly clear that Hall rested on the concept of the viable fetus as a person vested with legal rights.
“ ‘More recently, we held the word “person” as used in a criminal statute includes viable fetuses. State v. Horne, 282 S.C. 444, 319 S.E.2d 703 (1984), concerned South Carolina’s murder statute, S.C.Code Ann. § 16-3-10 (1976). The defendant in that case stabbed his wife, who was nine months’ pregnant, in the neck, arms, and abdomen. Although doctors performed an emergency caesarean section to deliver the child, the child died while still in the womb. The defendant was convicted of voluntary manslaughter and appealed his conviction on the ground South Carolina did not recognize the crime of feticide.
“ ‘This Court disagreed. In a unanimous decision, we held it would be “grossly inconsistent ... to construe a viable fetus as a ‘person’ for the purposes of imposing civil liability while refusing to give it a similar classification in the criminal context.” Id. at 447, 319 S.E.2d at 704 (citing Fowler v. Woodward, supra). Accordingly, the Court recognized the crime of feti-cide with respect to viable fetuses.
“ ‘Similarly, we do not see any rational basis for finding a viable fetus is not a “person” in the present context. Indeed, it would be absurd to recognize the viable fetus as a person for purposes of homicide laws and wrongful death statutes but not for purposes of statutes proscribing child abuse. Our holding in Hall that a viable fetus is a person rested primarily on the plain meaning of the word “person” in light of existing medical knowledge concerning fetal development. We do not believe that the plain and ordinary meaning of the word “person” has changed in any way that would now deny viable fetuses status as persons.
“ ‘The policies enunciated in the Children’s Code also support our plain meaning reading of “person.” S.C.Code Ann. § 20-7-20(0 (1985), which describes South Carolina’s policy . concerning children, expressly states: “It shall be the policy of this State to concentrate on the prevention of children’s problems as the most important strategy which can be planned and implemented on behalf of children and their families.” (emphasis added). The abuse or neglect of a child at any time during childhood can exact a profound toll on the child herself as well as on society as a whole. However, the consequences of abuse or neglect which takes place after birth often pale in comparison to those resulting from abuse suffered by the viable fetus before birth. This policy of prevention supports a reading of the word “person” to include viable fetuses. Furthermore, the scope of the Child’-en’s Code is quite broad. It applies “to all children who have need of services.” S.C.Code Ann. § 20-7-20(B) (1985) (emphasis added). When *407 coupled with the comprehensive remedial purposes of the Code, this language supports the inference that the legislature intended to include viable fetuses within the scope of the Code’s protection.’
“Whitner, 328 S.C. at 6-8, 492 S.E.2d at 779-81.
“Likewise, in the present case, we do not see any reason to hold that a viable fetus is not included in the term ‘child,’ as that term is used in § 26-15-8.2, Ala.Code 1975. Not only have the courts of this State interpreted the term ‘child’ to include a viable fetus in other contexts, the dictionary definition of the term ‘child’ explicitly includes an unborn person or a fetus. In everyday usage, there is nothing extraordinary about using the term ‘child’ to include a viable fetus. For example, it is not uncommon for someone to state that a mother is pregnant with her first ‘child.’ Unless the legislature specifically states otherwise, the term ‘child’ is simply a more general term that encompasses the more specific term ‘viable fetus.’ If the legislature desires to proscribe conduct against only a ‘viable fetus,’ it is necessary to use that specific term. However, if the legislature desires to proscribe conduct against a viable fetus and all other persons under a certain age, the term ‘child’ is sufficient to convey that meaning. In fact, proscribing conduct against a ‘child’ and a ‘viable fetus’ would be redundant.
“The term ‘child’ in § 26-15-3.2, Ala. Code 1975, is unambiguous; thus, this Court must interpret the plain language of the statute to mean exactly what it says and not engage in judicial construction of the language in the statute. Also, because the statute is unambiguous, the rule of lenity does not apply. We do not see any rational basis for concluding that the plain and ordinary meaning of the term ‘child’ does not include a viable fetus.”
Ankrom, 152 So.3d at 379-82. Citing An-krom, the Court of Criminal Appeals affirmed Kimbrough’s conviction in an unpublished memorandum.
As noted, both Ankrom and Kimbrough separately petitioned this Court for a writ of certiorari, alleging that the issue decided by the Court of Criminal Appeals in their respective cases presented a material question of first impression for this Court.

II. Standard of Review

“We review questions of statutory construction and interpretation de novo, giving no deference to the trial court’s conclusions. Greene v. Thompson, 554 So.2d 376 (Ala.1989).” Pitts v. Gangi, 896 So.2d 433, 434 (Ala.2004).

III. Discussion

Ankrom and Kimbrough were convicted of violating the chemical-endangerment statute by causing their unborn children to ingest a controlled substance. The facts of the petitioners’ cases are not disputed; thus, the only issue before this Court is whether the chemical-endangerment statute governs the petitioners’ conduct. We conclude that it does.
The chemical-endangerment statute, § 26-15-3.2, Ala.Code 1975, provides:
“(a) A responsible person commits the crime of chemical endangerment of exposing a child to an environment in which he or she does any of the following:
“(1) Knowingly, recklessly, or intentionally causes or permits a child to be exposed to,[1] to ingest or inhale, *408 or to have contact with a controlled substance, chemical substance, or drug paraphernalia as defined in Section ISA-12-260. A violation under this subdivision is a Class C felony.
“(2) Violates subdivision (1) and a child suffers serious physical injury by exposure to, ingestion of, inhalation of, or contact with a controlled substance, chemical substance, or drug paraphernalia. A violation under this subdivision is a Class B felony.
“(3) Violates subdivision (1) and the exposure, ingestion, inhalation, or contact results in the death of the child. A violation under this subdivision is a Class A felony.
“(b) The court shall impose punishment pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or a longer term of imprisonment.
“(c) It is an affirmative defense to a violation of this section that the controlled substance was provided by lawful prescription for the child, and that it was administered to the child in accordance with the prescription instructions provided with the controlled substance.”
The petitioners raise three main arguments on appeal. First, the petitioners argue that the Court of Criminal Appeals misapplied the chemical-endangerment statute in Ankrom when it applied that statute to the use of a controlled substance by a pregnant woman that resulted in the ingestion of that controlled substance by her unborn child. Next, the petitioners argue that the Court of Criminal Appeals’ decision in Ankrom is bad public policy. Finally, the petitioners argue that the Court of Criminal Appeals’ decision in An-krom violates both the United States Constitution and the Alabama Constitution.

A.

THE COURT OF CRIMINAL APPEALS ERRED IN ANKROM WHEN IT APPLIED THE CHEMICAL-ENDANGERMENT STATUTE TO THE USE OF A CONTROLLED SUBSTANCE BY A PREGNANT WOMAN THAT RESULTED IN THE INGESTION OF THAT CONTROLLED SUBSTANCE BY HER UNBORN CHILD.
The petitioners present seven arguments in support of their position that the chemical-endangerment statute does not protect unborn children.
1. The word “child, ” as used in the chemical-endangerment statute, does not include an unborn child.
Ankrom argues that “[t]he legislature did not intend for the term ‘child’ as used in [the chemical-endangerment statute] to impliedly include an unborn child,” An-krom’s brief, at 6, and states that this “Court must determine the intent of the legislature and ascribe meaning to the word ‘child’ that comports with the legislature’s intent.” Ankrom’s brief, at 8-9. *409 She argues that “[c]riminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation ” and that “all doubts concerning statutory interpretation are to predominate in favor of the accused.” Ankrom’s brief, at 7. Similarly, Kimbrough argues that “[b]eeause this is a criminal case, any perceived ambiguity in the chemical endangerment statute must be resolved in favor of reversing the conviction.” In support of her argument, Kimbrough cites Ex parte Bertram, 884 So.2d 889 (Ala.2003), and argues that the Court of Criminal Appeals “incorrectly determined that it need not observe the rule of lenity because the word ‘child’ plainly applied to a ‘viable fetus.’ ... [H]owever, its analysis demonstrates that the term ‘child’ is, at best, ambiguous.” Kimbrough’s brief, at 24. Thus, Kimbrough argues, “it is clear that this Court must reject the [Court of Criminal Appeals’] decision usurping the legislative function and rewriting Alabama law.” Kimbrough’s brief, at 25.
In Bertram, this Court stated:
“‘A basic rule of review in criminal cases is that criminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation, i.e., defendants.
“ ‘Penal statutes are to reach no -further in meaning than their words.
“ ‘One who commits an act which does not come within the words of a criminal statute, according to the general and popular understanding of those words, when they are not used technically, is not to be punished thereunder, merely because the act may contravene the policy of the statute.
“ ‘No person is to be made subject to penal statutes by implication and all doubts concerning their interpretation are to predominate in favor of the accused’ ”
884 So.2d at 891 (quoting Clements v. State, 370 So.2d 723, 725 (Ala.1979) (citations omitted; emphasis added in Bertram)).
In ascertaining the legislature’s intent in enacting a statute, this Court will first attempt to assign plain meaning to the language used by the legislature. As the Court of Criminal Appeals explained in Walker v. State, 428 So.2d 139, 141 (Ala.Crim.App.1982), “[although penal statutes are to be strictly construed, courts are not required to abandon common sense. Absent any indication to the contrary, the words must be given their ordinary and normal meaning.” (Citations omitted.) Similarly, this Court has held that “[t]he fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. If possible, the intent of the legislature should be gathered from the language of the statute itself.” Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1305 (Ala.1991).
We look first for that intent in the words of the statute. As this Court stated in Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala.1999):
“‘When the language of a statute is plain and unambiguous, as in this case, courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature.’ Ex parte T.B., 698 So.2d 127, 130 (Ala.1997). Justice Houston wrote the following for this Court in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270 (Ala.1998):
“ ‘In determining the meaning of a statute, this Court looks to the plain *410 meaning of the words as written by the legislature. As we have said:
“ ‘ “ ‘Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.’ ”
“ ‘Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); see also Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n, 589 So.2d 687, 689 (Ala.1991); Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm’n, 524 So.2d 357, 360 (Ala.1988); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984); Dumas Brothers Mfg. Co. v. Southern Guar. Ins. Co., 431 So.2d 534, 536 (Ala.1983); Town of Loxley v. Rosinton Water, Sewer & Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala.1979). It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997).’ ”
Thus, only when language in a statute is ambiguous will this Court engage in statutory construction. As we stated in Ex parte Pratt, 815 So.2d 532, 535 (Ala.2001), “[principles of statutory construction instruct this Court to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.”
As the Court of Criminal Appeals explained in Ankrom, the rule of construction referenced in Bertram applies only where the language of the statute in question is ambiguous; the issue in these cases is whether the plain, ordinary, and normal meaning of the word “child” includes an unborn child. Concluding that the word “child” in the chemical-endangerment statute plainly and unambiguously includes unborn children, the Court of Criminal Appeals stated in Ankrom that it was declining to “engage in judicial construction.” 152 So.3d at 379.
Kimbrough argues that “the chemical endangerment statute, by its plain language, does not apply to unborn children, pregnant women, or the biological processes that occur during pregnancy, labor, or delivery.” Kimbrough’s brief, at 10. Kim-brough argues that “[tjhere is no hint in the terms of this statute as they are ‘commonly understood’ that it has any application to a pregnant woman’s relationship to her fetus.” Kimbrough’s brief, at 12. Instead, Kimbrough argues, “[t]he ordinary meaning of [the word ‘child’ in the chemical-endangerment statute] is limited to children who have been born and therefore exist in a world where they might come in contact with drug paraphernalia or places where drugs are made or sold.” Kim-brough’s brief, at 12.
Kimbrough also argues that “[t]he extrinsic materials relied upon by the Court of Criminal Appeals do not support ex *411 panding the law to hold pregnant women criminally liable in relation to the viable fetus they carry.” Kimbrough’s brief, at 19. She argues that the chemical-endangerment statute is ambiguous because, she says, the Court of Criminal Appeals “had to resort to extrinsic material to support its purported plain language interpretation.” Kimbrough’s brief, at 19. That “reliance” on that extrinsic material, Kim-brough argues, “clearly acknowledges that the term ‘child’ in [the chemical-endangerment statute] is, at best, ambiguous.” Kimbrough’s brief, at 19. Additionally, Kimbrough argues that, even if the Court of Criminal Appeals correctly applied the definitions it cited, those definitions were selected in an “arbitrary” manner, and their selection demonstrates the “selection of a favorite definition” rather than a plain reading of the statute. Kimbrough’s brief, at 15-16.'
Conversely, the State argues that “[t]he plain meaning of the word ‘child,’ as used in the [chemical-eiidangerment] statute, includes an unborn child.” The State admits that the chemical-endangerment statute does not define the word “child,” but it argues that “an unborn child is a person.” Citing this Court’s decision in Carpet Installation & Supplies of Glencoe v. Alfa Mutual Insurance Co., 628 So.2d 560, 562 (Ala.1993), the State argues that “[t]his Court has stated that the dictionary definition of a word provides the meaning ordinary people give the word.” The State then cites definitions of the word “child” from Black’s Law Dictionary 271 (9th ed. 2009) (“[a] baby or fetus”), and Merriam-Webster’s Collegiate Dictionary 214 (11th ed. 2008) (“an unborn or recently born person”). State’s brief in Ankrom, at 8.
As the definitions cited by the State indicate, the plain meaning of the word “child” is broad enough to encompass all children — born and unborn — including Ankrom’s and Kimbrough’s unborn children in the cases before us. As the Court of Criminal Appeals said in Ankrom:
“Likewise, in the present case, we do not see any reason to hold that a viable fetus is not included in the term ‘child,’ as that term is used in § 26-15-3.2, Ala.Code 1975. Not only have the courts of this State interpreted the term ‘child’ to include a viable fetus in other contexts, the dictionary definition of the term ‘child’ explicitly includes an unborn person or a fetus. In everyday usage, there is nothing extraordinary about using the term ‘child’ to include a viable fetus. For example, it is not uncommon for someone to state that a mother is pregnant with her first ‘child.’ Unless the legislature specifically states otherwise, the term ‘child’ is simply a more general term that encompasses the more specific term ‘viable fetus.’ If the legislature desires to proscribe conduct against only a ‘viable fetus,’ it is necessary to use that specific term. However, if the legislature desires to proscribe conduct against a viable fetus and all other persons under a certain age, the term ‘child’ is sufficient to convey that meaning. In fact, proscribing conduct against a ‘child’ and a ‘viable fetus’ would be redundant.
“The term ‘child’ in § 26-15-3.2, Ala. Code 1975, is unambiguous; thus, this Court must interpret the plain language of the statute to mean exactly what it says and not engage in judicial construction of the language in the statute. Also, because the statute is unambiguous, the rule of lenity does not apply. We do not see any rational basis for concluding that the plain and ordinary meaning of the term ‘child’ does not include a viable fetus.”
152 So.3d at 382. We find this reasoning persuasive and agree with the Court of *412 Criminal Appeals that the plain meaning of the word “child” in the chemical-endangerment statute includes unborn children.
In her reply brief, Ankrom argues that the use of the word “or” in both definitions cited by the State is disjunctive, meaning that only one of the possible definitions could be applicable: i.e., if the word “child” can mean “recently born person” then it cannot also mean “unborn person”; if “child” can mean “unborn person” then it cannot also mean “recently born person.” Ankrom argues that “it is clear that the Alabama legislature’s intent coincides with the portion of Black’s and Merriam-Webster’s dictionaries that says ‘baby1 ‘or recently born person.’ ” Ankrom’s reply brief, at 6.
The use of the word “or,” however, does not always indicate that only one of the joined words is applicable in a particular situation. This Court has repeatedly recognized that the word “or” is not always intended to express strict disjunction. As this Court stated in Rutland v. Emanuel, 202 Ala. 269, 272, 80 So. 107, 110 (1918), “[i]t is hardly necessary to add that, notwithstanding the words ‘and’ and ‘or’ are, when abstractly considered, unambiguous in their respective meanings, the judicial function of reading one of them as if the other had been used is not thereby restricted.” See also Hilliard v. Binford’s Heirs, 10 Ala. 977, 996 (1847); In re Opinion of the Justices, 252 Ala. 194, 198, 41 So.2d 559, 563 (1949).[2]

2. Other statutes in the Alabama Code require this Court to interpret the word “child” as excluding unborn children.

Ankrom argues that “[t]here are many clues throughout Title 26 and other Alabama Code Sections which show that the legislature did not intend for [the chemical-endangerment statute] to apply to an unborn child or fetus.” Ankrom’s brief, at 9. She cites § 26-14-1(2), Ala.Code 1975, which defines “child” as “[a] person under the age of 18 years,” and § 26-16-91(2), Ala.Code 1975, which defines “child” as “[a] person who has not yet reached his or her eighteenth birthday.” Ankrom argues that these definitions, appearing in the chapters immediately preceding and following the chapter containing the chemical-endangerment statute, reflect the legislature’s intent in the chemical-endangerment statute, as well. Ankrom cites Draper v. State ex rel. Patillo, 175 Ala. 547, 557, 57 So. 772, 775 (1911), in which this Court stated that “[w]hen words which have a known meaning and significance are used in a statute, it must be presumed that the Legislature used or adopted them in their well-known meaning and sense; the contrary not appearing.”
Ankrom also notes that, in other statutes, the Alabama Legislature has chosen *413 to clarify its intent to include an unborn child within the statute by using the words “fetus,” see, e.g., § 26-23-1 et seq., Ala; Code 1975,[3] or “unborn child,” see, e.g., § 26-23A-1 et seq., Ala.Code 1975.[4] An-krom argues that, if the legislature had intended to include unborn children in the class of persons protected by the chemical-endangerment statute, it would have used either of those more specific terms to clarify the scope of the statute. Ankrom’s brief, at 10. Additionally, in her reply brief, Ankrom notes that the chemical-endangerment statute was enacted in 2006, the same year the legislature amended the homicide statute to specifically define “person” to include an unborn child. Ankrom’s reply brief, at 3.
Kimbrough, like Ankrom, points to specific instances where the Alabama Code specifically refers to unborn children and argues that “when the Alabama legislature legislates regarding the unborn it uses clear and unequivocal language, rather than the now ambiguous term ‘child.’” Kimbrough’s brief, at 27. Kimbrough also claims that the legislative intent to limit the meaning of the word “child” to children who have already been born is demonstrated by the exception in § 26-15-3.2(c), Ala.Code 1975, for medications prescribed to the child, because, she says, “[prescriptions are not written for” unborn children.[5] Kimbrough’s brief, at 12-13. Kimbrough also alleges that, if the definition of the word “child” includes unborn children, then many forms used by State agencies, which distinguish between children already born and children yet to be born, must be revised. Kimbrough’s brief, at 17-18.
Similarly, in her reply brief, Kimbrough argues that “[t]he meaning of the [chemical-endangerment] statute does not turn on the meaning of ‘child.’ ” Kimbrough’s reply brief, at 6. Kimbrough argues that “[t]he [chemical-endangerment] statute contains more than 50 words, none of which mention a pregnant' woman’s drug use” and that “the rules of statutory interpretation require a court to examine the statutory language as a whole.” Kim-brough’s reply brief, at 6. In support of this argument, Kimbrough cites Boutwell v. State, 988 So.2d 1015, 1020 (Ala.2007), in which this Court stated that, “[i]n interpreting a statute, a court does not construe provisions in isolation, but considers them in the context of the entire statutory scheme; moreover, to ascertain legislative intent, a court should look to the entire act instead of isolated phrases and clauses.”
In response, the State argues that the legislature’s general intent to protect unborn life is evident from a variety of other statutory provisions. For example, the legislature has stated that “[t]he public policy of the State of Alabama is to protect life, born, and unborn.” § 26-22-l(a), Ala. Code 1975. Similarly, the legislature has declared that'“[e]very child is entitled to live in safety and in health and to survive into adulthood.” § 26-16-90, Ala.Code 1975. The legislature has created an exception to the education requirements for a driver’s license when the person “is a parent with the care and custody of a *414 minor or unborn child.” § 16-28-40, Ala. Code 1975 (emphasis added). Unborn children are recognized as persons with regard to real property, see, e.g., § 19-3-170, Ala.Code 1975 (referring to “any other person, born or unborn”), and are specifically included within the definition of “person” in the homicide statute, see § 13A-6-1(a)(3), Ala.Code 1975 (defining “person” as “a human being, including an unborn child in útero at any stage of development, regardless of viability”). The State notes that, informed by these statutes, this Court has applied Alabama’s wrongful-death statute to protect unborn children at all stages of gestation. See Mack v. Carmack, 79 So.3d 597 (Ala.2011); Hamilton v. Scott, 97 So.3d 728 (Ala.2012). Ultimately, the State argues, “it would be inconsistent to treat an unborn child as a person for purposes of assigning civil and criminal liability, but not do so under [the chemical-endangerment statute].” State’s brief in Ankrom, at 16.
A review of the statutes cited by the petitioners and of the context of the chemical-endangerment statute provides no conclusive evidence as to how this Court should interpret the word “child” as that term is used in the chemical-endangerment statute. The statutory definitions of the word “child” cited by the petitioners are not conclusive because both set a maximum age for childhood without setting a minimum age. Similarly, when Kim-brough argues in her reply brief that “the examples put forth by the State show that the legislature uses the explicit term ‘unborn child’ to refer to the unborn, rather than rely on the now ambiguous term ‘child,’” Kimbrough’s reply brief, at 10, she fails to note that the legislature’s decision to use the more restrictive words “fetus” and “unborn child” was appropriate in those other statutes because those statutes applied only to protect unborn children.[6] In sum, nothing in the statutes cited by the petitioners contradicts the plain meaning of the word “child” in the chemical-endangerment statute to include an unborn child or requires this Court to interpret the word “child” as excluding unborn children.

3. The legislative histo'ry of attempts to amend the chemical-endangerment statute demonstrates that the word “child” as used in that statute does not include unborn children.

Kimbrough argues that “[t]he Legislative history of [the chemical-endangerment statute] and subsequent legislative inaction clarify that the Legislature never intended this law to apply to a [sic] pregnant women who continue to term and used a controlled substance.” Kim-brough’s brief, at 28. She claims that “[t]he sponsor” of the chemical-endangerment statute[7] “is on record saying he did not intend the law to be used against new mothers,”[8] Kimbrough’s brief, at 28-29, *415 and that “there have been several legislative attempts to amend the chemical endangerment statute to include fetuses exposed prenatally to controlled substances.” Kimbrough’s brief, at 29. She cites House Bill 723 (2008 Regular Session of the Alabama Legislature), which, she claims, would have amended the chemical-endangerment statute to apply specifically to unborn children, while adding an exception for medication prescribed for the treatment of the pregnant mother or the unborn child. Kimbrough’s brief, at 30. Kimbrough argues that “[t]he debate about the bill makes clear that its death was deliberate, not the result of an understanding that the existing law. already reached pregnant women who used an illegal drug and continued to term.” Kim-brough’s brief, at 30. She alleges that similar bills were introduced in 2010 (House Bill 601 (2010 Regular Session)) and in 2011 (House Bill 8 and Senate Bill 34 (2011 Regular Session)) and that none of those bills became law.[9] Thus, Kim-brough concludes, this history “leaves no doubt that these efforts have failed because of public health and public policy concerns relating to us[ing] the criminal law to address what the legislature itself recognizes to be health problems relating to pregnancy and drug use.” Kimbrough’s brief, at 34.
The State argues in response that the language of the chemical-endangerment statute “is clear: an unborn child is a ‘child’ as that word is used in the [chemical-endangerment statute].” State’s brief in Kimbrough, at 52-53. The State argues that, because the chemical-endangerment statute is unambiguous, “it would be inappropriate for this Court to examine extrinsic materials such as the Legislature’s failure to amend the statute.” State’s brief in Kimbrough, at 52-53. The State also argues that, “contrary to Kimbrough’s assumptions,” the amendments Kimbrough refers to “were originally intended to make it explicit that an unborn child is — and always has been — included within the [chemical-endangerment] statute’s protections.” State’s brief in Kimbrough, at 54. Thus, the State argues, “[t]he fact that the Legislature ultimately failed to take any *416 action on these proposed amendments may easily be read as proof that it believed the statute clearly included an unborn child within its protection and that it did not need clarification.” State’s brief in Kim-brough, at 54-55.
Interpreting a statute based on later attempts to amend that statute is problematic. As the United States Supreme Court stated in Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 638, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990):
“[S]ubsequent legislative history is a ‘hazardous basis for inferring the intent of an earlier’ Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks ‘persuasive significance’ because ‘several equally tenable inferences’ may be drawn from such inaction, ‘including the inference that the existing legislation already incorporated the offered change.’ ”
(Citations omitted.)
In this case, it is possible to conclude, as Kimbrough argues, that the legislature understood the original chemical-endangerment statute to protect only children who were already born. It is also possible to conclude, as the State argues, that the legislature understood the original chemical-endangerment statute to protect all children—born and unborn—and that proposals to amend the statute were unnecessary attempts to clarify the legislature’s original intent. This Court cannot determine the intentions of the legislature apart from the language in the chemical-endangerment statute that is now before us; as discussed supra, the plain meaning of that statutory language is to include within its protection unborn children. See LTV Corp., supra; Becton v. Rhone-Pou-lenc, Inc., 706 So.2d 1134, 1139 (Ala.1997) (“ ‘ “[Subsequent legislative history” is not helpful as a guide to understanding a law.’” (quoting Covalt v. Carey Canada Inc., 860 F.2d 1434, 1438 (7th Cir.1988), citing in turn Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988))).

í. The language in the child-endangerment statute makes that statute inapplicable to unborn children.

Kimbrough argues that the chemical-endangerment statute cannot plainly be read to protect unborn children because, she says, the word “environment” in the chemical-endangerment statute cannot refer to an unborn child’s existence within its mother’s womb. She states that “[n]o dictionary defines ‘environment’ to be synonymous with ‘pregnant woman,’ ‘uterus,’ or ‘womb.’ ” However, it is not necessary to find the words “uterus” or “womb” in the definition of the word “environment”; the word “environment” refers simply to a person’s surroundings, to the situation in which a person lives his or her life. Black’s Law Dictionary 479 (5th ed. 1979) defines “environment” as “[t]he totality of physical, economic, cultural, aesthetic, and social circumstances and factors which surround and affect ... the quality of peoples’ lives.” Clearly, for an unborn child, the mother’s womb is an essential part of its physical, circumstances; in the cases before us, it was while Ankrom’s and Kim-brough’s unborn children were within their mothers’ wombs that they ingested controlled substances.
Kimbrough also argues that “[t]he very title of the statute describes the criminalized action as exposing a child to an environment where controlled substances are ‘produced’ or ‘distributed’— neither of which would be within a reason *417 ably intelligent woman’s understanding of her bodily functions.” Kimbrough’s brief, at 18. These words appear solely in the title of the statute, not in the text of the statute, and, as this Court has previously held, the title of a statute does not override the plain meaning of the words contained in that statute:
“ ‘The title or preamble may be used to remove ambiguity or uncertainty in a statute; it cannot, however, be used to contradict the plain, unambiguous terms of the statute itself. See Newton v. City of Tuscaloosa, 251 Ala. 209, 218, 36 So.2d 487, 494 (1948) (“both the preamble and the title of an act may be looked to in order to remove ambiguities and uncertainty in the enacting clause”); United States v. McCrory, 119 F. 861 (5th Cir.1903) (if the act is free from doubt or ambiguity, the title of an act may not be resorted to in construing the act); and Bartlett v. Morris, 9 Port. 266 (Ala.1839) (the title of an act may explain what is doubtful, but it cannot control what is contained in the body of the act).’ ”
City of Bessemer v. McClain, 957 So.2d 1061, 1084 (Ala.2006) (Harwood, J., concurring in part and dissenting in part and quoting from main opinion on original deliverance (withdrawn on rehearing)) (emphasis added). In this case, because, given a plain-meaning reading, the word “child” in the chemical-endangerment statute includes unborn children, the use of the word “distribute” in the title of that statute cannot be interpreted to contradict the plain meaning of the text of the statute.

5. This Court should follow the majority of states in refusing to apply the chemical-endangerment statute to protect unborn children.

Kimbrough argues that, “[d]espite the overwhelming jurisprudence from other states refusing to extend criminal laws to pregnant women in relation to the unborn children they carry, ... [t]he [Court of Criminal Appeals] chose to follow one outlier state, South Carolina,” whose “unique law is inapplicable in Alabama.” Kim-brough’s brief, at 53. Whitner v. State 328 S.C. 1, 492 S.E.2d 777 (1997), is not persuasive, Kimbrough argues, because “South Carolina courts, ... unlike Alabama’s courts, have the authority to create new common law crime[s].” Kimbrough’s brief, at 54.
The State argues that, like the Court of Criminal Appeals, this Court “should rely on the persuasive reasoning of Whitner and find that [Ankrom’s and] Kimbrough’s prenatal drug use violated [the chemical-endangerment statute].” State’s brief in Kimbrough, at 30. Whitner, the State argues, is persuasive because South Carolina law, like Alabama law, permits a wrongful-death action for the death of an unborn child, and because, in both states, the word “person” is defined, at least for some criminal offenses, to include unborn children.
Additionally, the State argues that the cases relied on by the petitioners in advancing this argument are not persuasive because, the State says, “[m]any of the states that have disallowed the prosecution of pregnant women for conduct committed during their pregnancies have done so on grounds of statutory construction based on their own state law.” State’s brief in Kim-brough, at 39. For example, at least one state has separate statutory provisions covering cases of chemical endangerment involving unborn children. See Kilmon v. State, 394 Md. 168, 905 A.2d 306 (2006). Courts in other states, whose corresponding statutes prohibit “delivery” of the controlled substance to a child, have held that those statutes do not protect unborn children because use of the controlled substance by the mother and the transfer of *418 that substance to her child through her body is not “delivery.” See Johnson v. State, 602 So.2d 1288 (Fla.1992); State v. Luster, 204 Ga.App. 156, 419 S.E.2d 32 (1992); and People v. Hardy, 188 Mich.App. 305, 469 N.W.2d 50 (1991). Several courts have cited the fact that their state’s homicide statute did not apply to the killing of an unborn child as relevant to holding that the chemical-endangerment statutes in those states did not protect unborn children. See Reinesto v. Superior Court, 182 Ariz. 190, 894 P.2d 733 (1995); Commonwealth v. Welch, 864 S.W.2d 280 (Ky.1993). And, the California Supreme Court held that, according to California’s murder statute, a fetus was distinct from a human being; consequently, an unborn child was not a child for purposes of California’s chemical-endangerment statute. See Reyes v. Superior Court, 75 Cal.App.3d 214, 141 Cal.Rptr. 912 (1977).
Furthermore, the State argues:
“Alabama law, unlike the statutory schemes in some of these states, does not provide for separate treatment for crimes committed against unborn children. Instead, it expressly includes an unborn child within the definition of ‘person’ in its criminal homicide and assault statutes. Thus, in Alabama, violent crimes committed against unborn children are prosecuted under the same provisions as violent crimes committed against adults and children who have been born.”
State’s brief in Kimbrough, at 42 (citations omitted). The State notes that, unlike some other states that have addressed this issue, Alabama’s child-abuse statutes define a “child” as a person under the age of 18 years rather than a person between birth and 18 years. See Ala. Code 1975, §§ 26-14-1(3); 26-16-2(1); and 26-16-91(2). Compare State v. Geiser, 763 N.W.2d 469 (N.D.2009) (reversing the conviction of a pregnant mother under a statute similar to the chemical-endangerment statute, relying in part on a North Dakota statute expressly providing that age is to be calculated from birth).
In sum, although, as the petitioners correctly state, a majority of jurisdictions have held that unborn children are not afforded protection from the use of a controlled substance by their mothers, they nonetheless fail to convince this Court that the decisions of those courts are persuasive and should be followed by this Court. See Planned Parenthood v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (“[T]he State has legitimate interests from the outset of the pregnancy in protecting ... the life of the fetus that may become a child'” (quoted with approval in Hamilton v. Scott, 97 So.3d 728, 740 (Ala.2012) (Parker, J., concurring specially, joined by Stuart, Bolin, and Wise, JJ.))).

6. The Court of Criminal Appeals erred in holding that the plain meaning of the word “child” included viable unborn children when the definitions cited by that court did not mention viability.

Kimbrough notes that neither of the dictionary definitions of the word “child” cited by the Court of Criminal Appeals in An-krom mention “viability,” and she argues that those definitions are at odds with the Court of Criminal Appeals’ holding in An-krom, i.e., that the word “child” in the chemical-endangerment statute includes a “viable fetus.” Similarly, Ankrom argues in her reply brief that the holding of the Court of Criminal Appeals — that the word “child” includes a “viable fetus” even though the chemical-endangerment statute does not mention viability — demonstrates the ambiguity of the word “child” in the statute and requires this Court to look beyond the “plain meaning” of that word. Ankrom’s reply brief, at 7.
*419 The definitions of the word “child” cited by the Court of Criminal Appeals in An-krom do not distinguish between previable and viable unborn children because the viability distinction is not found in the plain meaning and ordinary usage of the word “child,” nor is it found in the plain meaning of the word “child” as that word is used in the chemical-endangerment statute. Instead, the Court of Criminal Appeals’ insertion of the viability standard into the definition of the word “child” was based on this Court’s previous decisions holding that parents could not bring a wrongful-death action for the death of an unborn child before viability. Those cases, particularly Gentry v. Gilmore, 613 So.2d 1241 (Ala.1993), adopted the viability distinction, at least in part, because of a misplaced deference to Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). After Ankrom was decided, however, this Court overruled Gentry in Mack v. Carmack, 79 So.3d 597 (Ala.2011), specifically permitting recovery of damages for the wrongful death of any unborn child, regardless of viability.
The Court of Criminal Appeals also looked to the South Carolina Supreme Court’s decision in Whitner. Whitner, like Gentry, relied on Roe and on Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), for its description of the State’s interest in the life of an unborn child before and after viability. However, outside the right to abortion created in Roe and upheld in Planned Parenthood, the viability distinction has no place in the laws of this State. See Hamilton v. Scott, 97 So.3d 728, 737 (Ala.2012) (Parker, J., concurring specially, with Stuart, Bolin, and Wise, JJ., joining).
Thus, although Whitner is persuasive on the issue whether an unborn child is a person and thus a “child,” we find Whitner1 s adoption of the viability distinction to be inconsistent with the plain meaning of the word “child” and with the laws of this State. Furthermore, to the extent that the Court of Criminal Appeals limited the applicability of the chemical-endangerment statute to viable unborn children in Ankrom, this Court expressly rejects that distinction as inconsistent with the plain meaning of the word “child” and with the laws of this State. Because we reject the Court of Criminal Appeals’ application of a viability distinction, the petitioners’ arguments on the issue are moot.
7. The Court of Criminal Appeals’ decision in Ankrom is “absurd. ”
Kimbrough argues that “[ajpplying [the chemical-endangerment statute] to pregnant women who continue to term despite having used a controlled substance would produce absurd and illogical results harmful to justice and public health unintended by the Alabama Legislature” and that “[sjtatutes should be construed to avoid absurd and irrational results.” Kimbrough’s brief, at 35. In support of this argument, Kimbrough quotes Lane v. State, 66 So.3d 824, 828 (Ala.2010) (quoting City of Bessemer v. McClain, 957 So.2d at 1075 (citations omitted)), in which we stated:
“ ‘To discern the legislative intent, the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, there is no room for judicial construction. If a literal construction would produce an absurd and unjust result that is clearly inconsistent with the purpose and policy of the statute, such a construction is to be avoided.’ ”
However, as discussed supra, this Court has determined that the “plain and ordinary meaning” of the word “child” in the chemical-endangerment statute is unambiguous; that, given its plain meaning, the word “child” includes unborn children; and that, consequently, the chemical-en *420 dangerment statute is applicable to An-krom and Kimbrough. As we stated in Ex parte Pratt, 815 So.2d at 535, “[principles of statutory construction instruct this Court to interpret the plain language of a statute to mean exactly what it says and to engage in judicial construction only if the language in the statute is ambiguous.” Thus, there is “no room for judicial construction” of the chemical-endangerment statute in this case, and we need not address the merits of Kimbrough’s reasons she believes that applying the chemical-endangerment statute to protect unborn children is absurd.

B.

THE COURT OF CRIMINALS APPEALS’ DECISION IN ANKROM IS BAD PUBLIC POLICY.
Although the briefs of the petitioners and of several amici curiae recite numerous potential public-policy implications of this Court’s decision in these cases, policy cannot be the determining factor in our decision; public-policy arguments should be directed to the legislature, not to this Court. As we stated in Boles v. Parris, 952 So.2d 364, 367 (Ala.2006): “[I]t is well established that the legislature, and not this Court, has the exclusive domain to formulate public policy in Alabama.”
This is not because policy is unimportant but because policy arguments are ill-suited to judicial resolution. See M & Assocs., Inc. v. City of Irondale, 723 So.2d 592, 599 (Ala.1998) (“‘There are reasonable policy arguments on both sides of this issue; however, the Legislature is the body that must choose between such conflicting policy considerations.’ ” (quoting City of Tuscaloosa v. Tuscaloosa Vending Co., 545 So.2d 13, 14 (Ala.1989))). For this reason, although we recognize that the public policy of this State is relevant to the application of this statute, we decline to address the petitioners’ public-policy arguments; we leave those matters for resolution by the legislature. As we stated in Marsh v. Green, 782 So.2d 223, 231 (Ala.2000), “[t]hese concerns deal with the wisdom of legislative policy rather than constitutional issues. Matters of public policy are for the Legislature and, whether wise or unwise, legislative policies are of no concern to the courts.” See also Cavalier Mfg., Inc. v. Jackson, 823 So.2d 1237, 1248 (Ala.2001), overruled on other grounds, Ex parte Thicklin, 824 So.2d 723 (Ala.2002) (“The Legislature is endowed with the exclusive domain to formulate public policy in Alabama, a domain upon which the judiciary shall not trod.”). We therefore refrain from considering the policy issues raised by the petitioners or amici curiae, limiting ourselves to interpreting the text of the chemical-endangerment statute.
We would be remiss if we failed to recognize that the legislature may disagree with the result of this Court’s interpretation and application of the chemical-endangerment statute and is free to amend the statute to effect a different scope for the application of the statute. As this Court said in Ex parte Jackson, 614 So.2d 405, 408 (Ala.1993):
“If the Legislature disagrees with our interpretation of [the statute], then it will enact appropriate legislation to modify the statute and yield a different result in subsequent cases. With that action, this Court would not be asked to do so. This Court will not make such a modification for it.”

a

THE DECISION OF THE COURT OF CRIMINAL APPEALS IN ANKROM VIOLATES BOTH THE UNITED STATES CONSTITUTION AND THE ALABAMA CONSTITUTION.
Ankrom and Kimbrough present four arguments pertaining to the constitu *421 tionality of the chemical-endangerment statute. The State contends that this Court should not address those constitutional arguments because, it says, “they are outside the scope of the writ granted by this Court.” The State’s brief, at 10. We agree. Neither Ankrom nor Kim-brough raised any constitutional arguments in their respective grounds of first impression, which were the only grounds on which we granted certiorari review; as noted above, we granted certiorari review to consider only the issue whether the word “child” in the chemical-endangerment statute includes an unborn child; we denied certiorari review as to all other grounds, including those grounds advancing constitutional arguments. Because these constitutional arguments are not properly before us, we will not address them.

IV. Conclusion

We conclude that Court of Criminal Appeals correctly held that the plain meaning of the word “child” in the chemical-endangerment statute includes an unborn child or fetus. However, we expressly reject the Court of Criminal Appeals’ reasoning insofar as it limits the application of the chemical-endangerment statute to a viable unborn child. With that exception, we agree with the decisions of the Court of Criminal Appeals in both Ankrom and Kimbrough, and we therefore affirm those decisions.
1110176 —AFFIRMED.
1110219 —AFFIRMED.
WOODALL, STUART, BOLIN, and MAIN, JJ., concur.
PARKER, J., concurs specially.
SHAW, J., concurs in part and concurs in the result.
MALONE, C.J., and MURDOCK, J., dissent.
WISE, J., recuses herself.*

. We note that, although the word “expose” is not defined in the chemical-endangerment statute and none of the parties have raised the meaning of that word as an issue in this case, *408 that word in a similar statute in another state has been interpreted to mean placing a child in a situation that involves a risk of physical harm. See State v. Gallegos, 171 P.3d 426, 430 (Utah 2007):
“We agree with defendants’ argument that there must be an actual risk of harm to a child in order for conduct to constitute 'exposure' under the statute....
"... If the mere presence, for example, of a controlled substance in the same room or house with children constitutes endangerment, many innocent possessors of legal prescription drugs in secure places in their homes would be committing felonies under the statute. Children are not ‘exposed to' substances they cannot acquire or be harmed by even though they may be under the same roof with them.”

. The multiple possibilities for the use and meaning of the word "or" are nothing new; as this Court explained in Harris v. Parker, 41 Ala. 604, 605 (1868):
"This construction of the language might be adopted, if we were bound to construe the word in the sense in which it is used by the best writers of the English language, and thus sacrifice the obvious meaning.... ‘Or’ is defined to be a 'connective, that marks an alternative;' ‘one of two; either; other.’ In strict accuracy, such is its signification .... But it is not always used in that sense. It is often, in common parlance, and even in written instruments, used in the sense of ‘both.’ ... Our Savior says: ‘For when two or three are gathered together in my name, there am I in the midst of them;' yet the Christian world does not understand that text to imply an assurance of his presence when one or the other of the specified numbers are gathered together, leaving it undetermined which. On the contrary, it is understood to convey a promise of presence both in a gathering of two, and in a gathering of three — as well in the one as in the other.”

. Chapter 23 of Title 26 of the Alabama Code is entitled the "Alabama Partial-Birth Abortion Ban Act of 1997.”

. Chapter 23A of Title 26 of the Alabama Code is entitled "The Woman's Right To Know Act.”

. Section 26-15-3.2(c), Ala.Code 1975, states:
"It is an affirmative defense to a violation of this section that the controlled substance was provided by lawful prescription for the child, and that it was administered to the child in accordance with the prescription instructions provided with the controlled substance.”

. Using the word "fetus” or "unborn child” in place of the word "child” would not have been appropriate in the chemical-endangerment statute because that statute also protects children after they have been born.

. Kimbrough’s assertion suggests that there was only 1 sponsor of the chemical-endangerment statute; however, there were actually 21 sponsors of Senate Bill 133, which was eventually enacted as Act No. 2006-204, Ala. Acts 2006. Act No. 2006-204 added § 26-15-3.2 to the Alabama Code.

.To support her assertion that the sponsor of the chemical-endangerment statute "is on record saying he did not intend the law to be used against new mothers,” Kimbrough cites Phillip Rawls, National Ire Over Ala. Prosecuting Pregnant Moms, USA TODAY (August 1, 2008), which on the day this opinion was released could be found at http://www. usatoday.com/news/nation/2008-08-01-4274196709_x.htm. In that article, former Alabama State Senator Lowell Barron, who was one of the 21 sponsors of the chemical-endangerment statute, stated; "I hate to see a *415 young mother put in prison away from her child. But if she could be put in a treatment program with her children, that would be the best course. Maybe we need to revisit the legislation.” Former Senator Barron’s views are irrelevant; this Court will not rely solely on the views of a single legislator in ascertaining the intent of a bill, even when that legislator was a sponsor of the bill. See, e.g., Utility Ctr., Inc. v. City of Ft. Wayne, 868 N.E.2d 453, 459 (Ind.2007) (" 'In interpreting statutes, we do not impute the opinions of one legislator, even a bill’s sponsor, to the entire legislature unless those views find statutory expression.’ ” (quoting A Woman’s Choice-East Side Women's Clinic v. Newman, 671 N.E.2d 104, 110 (Ind.1996), citing in turn O'Laughlin v. Barton, 582 N.E.2d 817, 821 (Ind.1991))); Doe v. Bridgeport Police Dep't, 198 F.R.D. 325, 348 n. 16 (D.Conn.2001) (" 'Post-enactment views of those involved with the legislation should not be considered when interpreting the statute.’ " (quoting 2A Singer, Sutherland Statutory Construction § 48:20, at 184 (5th ed. 1999 Supp.))); Davis v. City of Leawood, 257 Kan. 512, 528, 893 P.2d 233, 244 (1995) (concluding that "post-enactment statements of individual legislators” are not "reliable indicators of the legislative intent”); In re F.D. Processing, Inc., 119 Wash.2d 452, 461, 832 P.2d 1303, 1308 (1992) (”[T]he comments of a single legislator are generally considered inadequate to establish legislative intent.” (citing Yakima v. International Ass’n of Fire Fighters, Local 469, 117 Wash.2d 655, 818 P.2d 1076 (1991), and Convention Ctr. Coalition v. Seattle, 107 Wash.2d 370, 730 P.2d 636 (1986))).

. Additionally, we take judicial notice of the fact that again during the 2012 Regular Session of the Alabama Legislature another bill amending the chemical-endangerment statute (Senate Bill 31) was introduced. That bill likewise did not pass.