Rel: December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

### CR-2024-0239

_____

### Joseph Clarence Cox

### v.

### State of Alabama

### Appeal from Etowah Circuit Court
### (CC-21-1877, CC-21-1878, and CC-22-154)

PER CURIAM.

Joseph Clarence Cox was convicted of two counts of rape in the first degree by forcible compulsion, see § 13A-6-61(a)(1), Ala. Code 1975, two counts of sodomy in the first degree by forcible compulsion, see § 13A-6-63(a)(1), Ala. Code 1975, and eight counts of sexual abuse in the first

degree by forcible compulsion, see § 13A-6-66(a)(1), Ala. Code 1975. The trial court sentenced Cox to 25 years' imprisonment for each of the rape and sodomy convictions and to 10 years' imprisonment for each of the sexual-abuse convictions, the sentences to run consecutively.

Cox, who was a dentist, was charged in 3 separate indictments with 18 sex offenses involving 12 different women, all of whom were either employees or patients of his dental practice. The trial court consolidated the indictments for trial over Cox's objection. Before trial, the State dismissed three of the charges, and the jury subsequently acquitted Cox of three charges.[1] The jury convicted Cox of 12 sex offenses involving 8 women. Specifically, Cox was convicted of one count of sexual abuse in the first degree with respect to A.H., a patient (case no. CC-21-1877); one count of sexual abuse in the first degree with respect to S.T., an employee (case no. CC-21-1878); one count of rape in the first degree, two counts of sodomy in the first degree, and one count of sexual abuse in the first degree with respect to K.H., an employee (case no. CC-22-154); one count of rape in the first degree and one count of sexual abuse in the first degree

---

[1]In case no. CC-22-154, the State dismissed one charge of sexual abuse in the first degree and two charges of indecent exposure, and the jury acquitted Cox of three charges of sexual abuse in the first degree.

with respect to C.K., an employee (case no. CC-22-154); one count of sexual abuse in the first degree with respect to B.B., an employee (case no. CC-22-154); one count of sexual abuse in the first degree with respect to A.J., an employee (case no. CC-22-154); one count of sexual abuse in the first degree with respect to B.J., an employee (case no. CC-22-154); and one count of sexual abuse in the first degree with respect to A.P., an employee (case no. CC-22-154). We note that Cox asserted the defense of consent to the rape and sodomy charges and denied the sexual-abuse charges. Cox timely filed a motion for a new trial, which the trial court denied after a hearing.

## I.

Cox first contends on appeal that the evidence was insufficient to sustain his convictions. He preserved this issue by moving for a judgment of acquittal at the close of the State's case and by raising the issue in his motion for a new trial.

> "'"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So. 2d 1033, 1034 (Ala. Crim. App. 1998), quoting Faircloth v. State, 471 So. 2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So. 2d 493 (Ala. 1985). '"The test used in

3

determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). '"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision."' Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978)."

Gavin v. State, 891 So. 2d 907, 974 (Ala. Crim. App. 2003). The victim's testimony, alone, is sufficient to sustain a conviction. See, e.g., Black v. State, 295 So. 3d 1120 (Ala. Crim. App. 2019), and the cases cited therein.

A person commits the crime of rape in the first degree if that person "[e]ngages in sexual intercourse with another person by forcible compulsion." § 13A-6-61(a)(1), Ala. Code 1975. Sexual intercourse "has its ordinary meaning and occurs upon any penetration, however slight; emission is not required." § 13A-6-60(4), Ala. Code 1975. A person commits the crime of sodomy in the first degree if that person "[e]ngages in sodomy with another person by forcible compulsion." § 13A-6-63(a)(1), Ala. Code 1975. Sodomy is "[a]ny sexual act involving the genitals of one

4

person and the mouth or anus of another person." § 13A-6-60(5), Ala. Code 1975.

A person commits the crime of sexual abuse in the first degree if that person "[s]ubjects another person to sexual contact by forcible compulsion." § 13A-6-66(a)(1), Ala. Code 1975. Sexual contact is "[a]ny touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party" but "does not require skin to skin contact." § 13A-6-60(3), Ala. Code 1975. Intimate parts "refers to any part of the body which a reasonable person would consider private with respect to touching by another," including any "parts of the body in close proximity to the primary sexual areas which a reasonable person would deem private." Parker v. State, 406 So. 2d 1036, 1039 (Ala. Crim. App. 1981). The mouth, breast, buttocks, stomach, and thigh are all considered to be intimate parts. See, e.g., Cofer v. State, [Ms. CR-2023-0008, May 3, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024); Lucas v. State, 204 So. 3d 929 (Ala. Crim. App. 2016); D.L.R. v. State, 188 So. 3d 720 (Ala. Crim. App. 2015); Pettibone v. State, 91 So. 3d 94 (Ala. Crim. App. 2011); and Parker, supra. See also § 13A-11-40(a)(1), Ala. Code 1975 (defining "intimate areas" for purposes of the voyeurism

5

statutes as "[a]ny portion of a person's body, whether or not covered by undergarments, that are traditionally covered by undergarments to protect that portion from public view, including genitals, pubic areas, buttocks, and female breasts"). In addition, the term sexual contact includes not only the defendant's touching the sexual or intimate parts of the victim, but the victim's touching the sexual or intimate parts of the defendant "as long as that touching is caused by the defendant." D.L.R., 188 So. 3d at 728. See also Lucas, 204 So. 3d at 934 ("[E]vidence that a defendant subjected a victim to the touching of his sexual or other intimate parts was sufficient evidence to show sexual contact.").

The legislature amended the definition of forcible in 2019, before the crimes in this case occurred. See Act. No. 2019-465, Ala. Acts 2019. Before the 2019 amendment, forcible compulsion required either "[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." Former § 13A-6-60(8), Ala. Code 1975. Section 13A-6-60(1), Ala. Code 1975, now provides:

> "Forcible Compulsion. Use or threatened use, whether express or implied, of physical force, violence, confinement, restraint, physical injury, or death to the threatened person or to another person. Factors to be considered in determining

6

an implied threat include, but are not limited to, the respective ages and sizes of the victim and the accused; the respective mental and physical conditions of the victim and the accused; the atmosphere and physical setting in which the incident was alleged to have taken place; the extent to which the accused may have been in a position of authority, domination, or custodial control over the victim; or whether the victim was under duress. Forcible compulsion does not require proof of resistance by the victim."

Notably, the 2019 amendment expressly removed the requirement that the victim resist the use of force and the requirement that a threat place the victim in "fear of immediate death or serious physical injury." Moreover, the amendment expanded the definition to include not only "physical force" but also "violence, confinement, restraint, physical injury, or death." In addition, the legislature provided a list of factors to be considered in determining whether there is an implied threat, which we note are the same factors the Alabama Supreme Court adopted in Powe v. State, 597 So. 2d 721 (Ala. 1991), under the former definition of forcible compulsion, for determining whether there was an implied threat when the victim was a child. Based on the plain language of § 13A-6-60(1), the list of factors is not exclusive; rather, the totality of the circumstances must be considered in determining whether there was an implied threat. What remains the same across both definitions is that

forcible compulsion may be proved either by showing that the defendant actually used force[2] or by showing that the defendant threatened the use of force.

Cox's arguments on appeal focus on the element of forcible compulsion. Cox contends that it is undisputed that he did not use any force against any of the women and that he did not expressly threaten any of the women with force. According to Cox, the only issue is whether the State presented sufficient evidence indicating that he implicitly threatened the women with force, and he argues that the State did not. We disagree with Cox's characterization of the evidence as being undisputed that he did not use force against any of the women, and, as explained below, we conclude that the State did, in fact, present sufficient evidence indicating that Cox used force against four of the women. We also conclude, with respect to one woman, that there was sufficient evidence of an implied threat of force. However, as to three of the women, we agree that the State failed to present sufficient evidence indicating that Cox either used, or threatened to use, force.

---

[2]References in this opinion to the general term "force" are references to the types of force listed in § 13A-6-60(1), e.g., physical force, violence, confinement, restraint, physical injury, or death.

8

A.

Cox first contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to A.P., who worked for Cox as a dental assistant.

A.P. testified that she worked for Cox in 2020, often in the onsite laboratory preparing prosthetics, such as crowns. According to A.P., within a month of starting work, Cox began coming into the lab, "lean[ing] down and kiss[ing her] on the top of the head" while telling her she "was his beautiful, talented [A.P.]" (R. 309.) This behavior progressed, A.P. said, to Cox's calling her into his private office, commenting on "how beautiful [she] looked" and having her sit in his lap. (R. 309.) A.P. said that sometimes Cox would simply ask her to sit in his lap but that "a number" of times Cox "pull[ed her] arm and pull[ed her] into his lap." (R. 310.) A.P. testified that Cox then began to "slap [her] butt or grab [her] butt" while she was in the lab or while she was walking down the hall. (R. 310.) A.P. also testified about two specific incidents involving Cox. The first incident occurred when A.P. was in a room sterilizing instruments -- a room that testimony indicated was a "closet"

9

(R. 479) and was small enough that someone "walking past" the room could reach through the doorway and touch the person inside the room. (R. 635.) A.P. said that Cox came up behind her, "reaching between [her] legs and rubbing up from the front to the back." (R. 310.) The second incident, A.P. said, occurred when Cox came to her workstation in the lab. A.P. testified that Cox came in and asked her for a hug. She kept her body turned sideways because she "never wanted to face him." (R. 311.) Cox put one arm around her and tried to turn her around to face him, but when "he could tell that [she] wasn't turning [her] body," he wrapped his other arm around her and "pressed his private up against [her] leg that was clearly erect, and rubbed back and forth -- rubbed his hips back and forth on [her] leg." (R. 311-12.)

Viewing the evidence in a light most favorable to the State, we conclude that there was sufficient evidence from which the jury could have reasonably concluded that Cox subjected A.P. to sexual contact by forcible compulsion. First, Cox used physical force when he, "a number" of times, gripped A.P.'s arm and pulled her onto his lap while in his private office, at which point A.P.'s buttocks, an intimate part, were touching Cox. In A.B.T. v. State, 620 So. 2d 120 (Ala. Crim. App. 1992),

10

this Court held that the defendant's gripping the victim's arm constituted physical force for purposes of forcible compulsion, and in Richards v. State, 475 So. 2d 893 (Ala. Crim. App. 1985), this Court held that the defendant's physically manipulating the victim's body constituted physical force for purposes of forcible compulsion. Also, in S.M.B. v. State, 348 So. 3d 438 (Ala. Crim. App. 2021), this Court held that the defendant had used physical force when he placed the sleeping victim's hand on his penis. Although each of those cases was decided under the former definition of forcible compulsion,[3] they are nonetheless instructive

_____

[3]We recognize that the victims in both A.B.T. and Richards were minor children and that this Court has held that "a different standard must be applied when ... the victim is a child and not a mature woman." Lee v. State, 586 So. 2d 264, 266 (Ala. Crim. App. 1991). However, in neither A.B.T. nor Richards was our finding that the defendant's actions constituted physical force based on the victims' being children. Moreover, in S.M.B., this Court ultimately concluded that the evidence was insufficient to establish forcible compulsion because the defendant had stopped using physical force when the victim woke up and resisted, noting that "[t]his Court has held that, when a defendant stops touching a victim because the victim resists the touching, that original touching does not subject the victim to sexual contact by forcible compulsion." 438 So. 3d at 451 (citing McGlocklin v. State, 910 So. 2d 154 (Ala. Crim. App. 2005)). In other words, this Court held that there was insufficient evidence of forcible compulsion because the defendant's use of physical force did not overcome the victim's resistance. However, under the current definition of forcible compulsion, the force used by a defendant does not have to overcome the victim's resistance because the victim is not required to resist.

11

as to what constitutes physical force, a term that remains in the current definition of forcible compulsion. By gripping A.P.'s arm and pulling her to his lap, Cox used physical force against A.P.

Second, Cox used physical force and restraint when he wrapped his arms around A.P. and rubbed his penis against her leg. The legislature has not defined the term restraint for purposes of forcible compulsion, but "'"'when a term is not defined in a statute, the commonly accepted definition of the term should be applied.'"'" Lawrence v. State, 389 So. 3d 1237, 1245 (Ala. Crim. App. 2023) (citations omitted). "'[A]lthough penal statutes are to be strictly construed, courts are not required to abandon common sense. Absent any indication to the contrary, the words must be given their ordinary and normal meaning.'" Ex parte Ankrom, 152 So. 3d 397, 409 (Ala. 2013) (quoting Walker v. State, 428 So. 2d 139, 141 (Ala. Crim. App. 1982)). Restraint is defined as "an act of restraining" or "the state of being restrained." Merriam-Webster's Collegiate Dictionary 1063 (11th ed. 2020) Restrain, in turn, is defined as "to prevent from doing, exhibiting, or expressing something" or "to limit, restrict, or keep under control." Id. at 1063. In addition, the legislature defined the term restrain for purposes of the kidnapping

12

statutes as "[t]o intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved." § 13A-6-40(1), Ala. Code 1975. The Commentary to § 13A-6-40 notes:

> "'Restrain' is concerned with intentional, unlawful and nonconsensual removal or confinement of another person so as to 'interfere substantially with his liberty' or physical locomotion. It is a <u>broad term covering</u> various factual situations from the most serious cases down to <u>relatively minor removals and brief confinements</u> not involving any high degree of isolation, disappearance or violence."

(Emphasis added.)[4] By wrapping his arms around A.P., Cox used physical force and restraint that restricted A.P.'s movements, prevented her from leaving, and interfered with her liberty.

For the above reasons, the evidence was sufficient to sustain Cox's conviction for sexual abuse in the first degree with respect to A.P.

B.

---

[4]See Part I.E. of this opinion, wherein we address the term confinement.

13

Cox next contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to S.T., who worked for Cox as a dental hygienist.

S.T. testified that she began working for Cox around August 2019. S.T. described her initial interview with Cox as "weird" because he called her into the office "on a day that the office was closed" and, toward the end of the interview, Cox asked her: "So are you going to -- I don't get a kiss or anything? I gave you the job. I don't get a kiss? I picked you. How many kids do you have? Now your kids are my kids. Do I get a kiss?" (R. 406-08.) S.T. said, however, that she worked for Cox for approximately a year and a half without incident. After that year and a half, S.T. said, employees began to leave the dental practice and Cox's behavior changed. S.T. described five incidents involving Cox that occurred after his behavior changed.

The first incident occurred when she was walking down a hallway one day and Cox told her she looked nice in her scrubs and "hit [her] on the butt." (R. 410.) The second incident occurred sometime later, when she went to Cox's office to ask him to check on one of her patients. S.T.

14

said that Cox asked her to show him something on his computer and that the door to the office closed behind her. According to S.T., Cox "trapped" her at his desk and asked: "Do you not like it when I touch you?" (R. 412-13.) S.T. told Cox that she did not like it and left the office, reporting the incident to the office manager. The third incident occurred the next day. S.T. testified that she was with a patient when Cox came into the room, came up behind her, "took his hand and, like, gripped, like, between [her] legs with his fingers," including her "private area." (R. 414.) S.T. jumped and moved away. Later that same day, as Cox was leaving the office, he told S.T. that he loved her and that he knew she loved him too.

The fourth incident occurred when S.T. spoke with Cox about his behavior and told him she did not want him to touch her. In response, Cox told her "that he's the dentist, sometimes he just needs love, he does hard work, he doesn't see anything wrong with, you know, something here or there" and that "if you're not into that, that's fine." (R. 416.) As S.T. began to leave, however, Cox said: "Come on. Please, give me a hug. Give me a kiss." (R. 416-17.) S.T. did not testify whether she and Cox hugged or kissed or whether any other sexual contact occurred during that incident. The fifth incident occurred sometime later when Cox called

15

S.T. into his office, "pinned" and "pressed" her "against the door" (R. 418, 437), and "tried to kiss" her. (R. 429.) S.T. did not state that Cox actually kissed her. Rather, S.T. said that she turned her face away and that she could feel Cox's facial hair on her face. S.T. fled the office and never returned to work.

S.T. testified that she did not feel safe continuing to work for Cox and that she informed Cox via text message that she was quitting and why. Among other things, S.T. told Cox in the text message that the workplace had "become scary, awkward and stressful" and that, despite her telling Cox that she was uncomfortable, he continued with his behavior. (C. 236.) In response, Cox sent the following text messages to S.T. the same day she quit, which S.T. did not respond to:

> "Please don't [S.T.] It will devastate me. I am very very sorry. I will never again. I am not downplaying anything. Please don't leave. I need you. Please for my family[']s sake everything will be ok."

> "Please come in and talk with me this morning[.]"

> "I have 3 small children and a wife [S.T.] please have mercy on me. I am begging you please stay. Please don't ruin my career."

> "Just one chance it will never never happen again!!!"
> "I'm sick and throwing up I had no idea that that affected you that much. I am forever sorry to you [S.T.]"

16

(C. 232-34.)  S.T. said that all the incidents occurred within a period of about a week and a half.

Viewing the evidence in a light most favorable to the State, we conclude that there was sufficient evidence from which the jury could have reasonably concluded that Cox subjected S.T. to sexual contact by forcible compulsion, specifically when he came up behind her while she was tending to a patient and grabbed her between her legs.

There is no question that grabbing a person's sexual or intimate parts constitutes not only sexual contact but physical force as well. However, sexual abuse in the first degree requires that the defendant "[s]ubject[] another person to sexual contact <u>by</u> forcible compulsion." § 13A-6-66(a)(1) (emphasis added).  The use of the word "by" clearly indicates that the force required for forcible compulsion is force beyond that inherent in the sexual contact itself.  In other words, nonconsensual sexual contact that involves only the force inherent in the sexual contact itself does not establish forcible compulsion.  To hold otherwise would effectively remove the forcible-compulsion element of sexual abuse in the first degree.  Therefore, although grabbing a person's sexual or intimate parts, or any other bodily part for that matter, is itself forceful, the State

17

was required to prove that Cox used force beyond the sexual contact. Even viewing the evidence in a light most favorable to the State, S.T.'s testimony provided no basis from which the jury could have reasonably concluded that Cox used, or expressly threatened to use, physical force, violence, confinement, restraint, physical injury, or death beyond the sexual contact itself when he grabbed between S.T.'s legs. Therefore, we consider whether the evidence was sufficient to establish the existence of an implied threat to use physical force, violence, confinement, restraint, physical injury, or death.

As noted above, in determining whether there is an implied threat, the factors to be considered include, but are not limited to: the relative ages and sizes of the victim and the defendant; the mental and physical conditions of the victim and the defendant; the atmosphere and physical setting in which the incident took place; whether the defendant was in a position of authority, domination, or custodial control over the victim; and whether the victim was under duress. See § 13A-6-60(1). Both Cox and S.T. were adults and the incident occurred in the workplace during working hours, but there is no question that Cox, as S.T.'s employer, was in a position of authority over S.T. Although the record does not reflect

18

the sizes of Cox and S.T., the jury was able to observe their respective sizes during trial. In addition, S.T. testified about two different incidents during which Cox did use physical force, confinement, and/or restraint against her -- when Cox "trapped" her at his desk and asked her if she liked it when he touched her and when Cox "pinned" or "pressed" her against the door to his office and tried to kiss her. Although neither of those incidents involved sexual contact, the incident during which Cox "trapped" S.T. at his desk occurred the day before he grabbed between her legs, and all the incidents occurred within a period of a week and a half. In addition, S.T. testified that she did not feel safe working for Cox, and, in her text message to Cox informing him that she was quitting her job, she described the workplace as "scary."[5]

Considering the totality of the circumstances -- including Cox's position as S.T.'s employer, his use of force against S.T. on two occasions, his subjecting S.T. to sexual contact on two occasions, S.T.'s testimony that she felt unsafe working for Cox, and her description of the workplace as "scary" -- we believe that there was sufficient evidence from which the

---

[5]Although fear on the part of the victim is not required under the current definition of forcible compulsion, it is certainly a relevant factor to consider in determining whether there was an implied threat.

19

jury could have reasonably concluded that, when Cox grabbed S.T. between her legs only one day after having used force against her to "trap" her at his desk and she had told him she did not like him touching her, there was an implied threat from Cox that he would use physical force, violence, confinement, restraint, physical injury, or death against S.T.

Therefore, the evidence was sufficient to sustain Cox's conviction for sexual abuse in the first degree with respect to S.T.

C.

Cox also contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to A.J., who worked for Cox as a dental hygienist and dental assistant.

A.J. testified that she began working for Cox in June 2020 and that her employment ended toward the end of September 2020. On her first day of work, A.J. said, Cox called her into his office and gave her "a big ole hug," telling her how "excited" he was that she was there. (R. 449.) According to A.J., as they were releasing the hug, Cox "brought [her] back in really quick, and he slapped [her] on [her] butt three times." (R. 449.)

A.J. said that the slaps were so hard her "skin popped." (R. 449.) As she pulled away, A.J. said, Cox asked her to give him a kiss on the cheek and she refused. A.J. testified that Cox was so close to her that she "could feel his skin on [her] face." (R. 449.) A.J. said that no further incidents occurred "[f]or a long time" after that (R. 450), and when asked if she felt safe continuing to work for Cox, A.J. said "yes and no" because "he hadn't messed with" her for a long time, but she "was waiting for it to happen again" and was "on guard." (R. 453.)

A.J. testified that, one day toward the beginning of September 2020, when she was going to a fast-food restaurant to pick up lunch, she asked Cox if he wanted her to bring him something. Instead of asking her to bring something back for him, Cox chose to ride with A.J. During the car ride, A.J. said, Cox grabbed one of her wrists and began "pulling it towards the passenger side" of the car. (R. 455.) When A.J. pulled her wrist away, Cox grabbed it again, slid down in his seat, and said: "Just touch it one time, [A.J.], please. Just touch my [penis] one time." (R. 459.) A.J. again pulled her wrist away and reminded Cox that he was married, that she had a boyfriend, and that he was her boss. She told Cox "to not

21

ever ask [her] to touch his [penis] again," and Cox "laughed it off," half-heartedly apologizing and promising never to do it again. (R. 549.)

The only sexual contact about which A.J. testified was Cox's slapping her buttocks on her first day of work. Although slapping a person's sexual or intimate parts is itself forceful, as explained in Part I.B. of this opinion, to establish forcible compulsion the State was required to prove that Cox used force beyond that inherent in the sexual contact itself. A.J. testified only that, as she and Cox were releasing a hug, Cox "brought [her] back in really quick" and slapped her buttocks. This limited testimony by A.J. about Cox's actions was not sufficient to indicate that Cox used force against her. A hug, even if unwanted, does not rise to the level of physical force, violence, confinement, restraint, physical injury, or death. Nor was there any evidence presented indicating that Cox expressly threatened A.J. with the use of such force. Therefore, we consider whether the evidence was sufficient to establish the existence of an implied threat of physical force, violence, confinement, restraint, physical injury, or death by looking at the factors in § 13A-6-60(1) and the totality of the circumstances.

Both Cox and A.J. were adults and the incident occurred in the workplace during working hours, but there is no question that Cox, as A.J.'s employer, was in a position of authority over A.J. Although the record does not reflect the sizes of Cox and A.J., the jury was able to observe their respective sizes during trial. A.J. testified about a second incident in which Cox used physical force against her by grabbing her wrist and pulling it toward him while they were driving to get lunch, but no sexual contact occurred during that incident and it occurred two to three months after the incident involving sexual contact. In addition, unlike S.T., see Part I.B. of this opinion, who expressly stated that she felt unsafe continuing to work for Cox and described the work environment as "scary," A.J. testified that she felt both safe and unsafe continuing to work for Cox, but only because she was waiting for another incident to occur. Even viewing the evidence in a light most favorable to the State, considering the totality of the circumstances, we have no choice but to conclude that the evidence was insufficient to establish the existence of an implied threat on A.J.'s first day of work that Cox would use physical force, violence, confinement, restraint, physical injury, or death against A.J.

We reject the State's argument that the "inherently coercive circumstances present" in an employer-employee relationship are alone sufficient to establish an implied threat. (State's brief, p. 46.) According to the State, "'[i]n the light of economic, professional, and institutional constraints, an employee often feels that no practical choices are available to her'" and "'[h]er decision to submit under these compelling circumstances should not be upheld by the law as a valid choice.'" (State's brief, p. 46 (quoting Michal Buchhandler-Raphael, Sexual Abuse of Power, 21 U. Fla. J.L. & Pub. Pol'y 77, 132 (2010)). Our holding, however, is not that A.J. made a "valid choice" to submit to Cox's slapping her buttocks -- she certainly did not -- but that Cox's actions did not rise to the level of forcible compulsion as that term is defined in § 13A-6-60(1). The definition of forcible compulsion is clear that the threat, whether express or implied, must be a threat to use physical force, violence, confinement, restraint, physical injury, or death. Economic and professional consequences, such as job loss, are not the equivalent of physical force, violence, confinement, restraint, physical injury, or death. Thus, although the fact that an abuser is the victim's employer is certainly a relevant factor to consider in determining whether there is an

24

implied threat, it is not, by itself, sufficient to establish an implied threat to use physical force, violence, confinement, restraint, physical injury, or death.

Although Cox's actions toward A.J. were reprehensible, they do not rise to the level of the felony offense of sexual abuse in the first degree by forcible compulsion. Therefore, because the State failed to present sufficient evidence of forcible compulsion, we must reverse Cox's conviction for sexual abuse in the first degree with respect to A.J. and render a judgment in his favor.[6]

## D.

Cox contends that the State failed to present sufficient evidence of forcible compulsion to sustain his convictions for one count of rape in the first degree and one count of sexual abuse in the first degree with respect to C.K., who worked for Cox as a dental assistant.

---

[6]The jury was not instructed on any lesser-included offenses; therefore, this Court does not have the option to order the entry of a judgment convicting Cox of a lesser offense. Cf. Lucas v. State, 204 So. 3d 929 (Ala. Crim. App. 2016) (finding insufficient evidence to sustain the defendant's conviction for attempted sodomy in the first degree and ordering the trial court to enter a judgment on the lesser offense of attempted sexual misconduct where the jury was instructed on attempted sexual misconduct).

C.K. testified that she first encountered Cox in late July 2020, when she was a waitress at a local restaurant and Cox was a customer. C.K. said that Cox "commended [her] on how good of a work ethic [she] had" and offered her a job at his dental practice. (R. 495.) Despite her having no experience in the dental field, Cox told her that she would receive on-the-job training. About a month after she started working for Cox, C.K. said, Cox began coming into the room used for sterilizing instruments while she was working there and "rub[bing] his hand across [her] bottom" or "put[ting] it on [her] hip." (R. 500.)

Later, Cox began calling her into his private office and having her sit on his lap while going over her patient notes. C.K. said that the door to Cox's office was always closed and was locked "[a]lmost every time." (R. 501.) She also said that when she resisted sitting on Cox's lap, Cox would ignore her, "grab [her] by the waist and place [her] on his leg." (R. 501-02.) Cox would wrap his arm around C.K.'s waist and rest his hand on her hip, and, on one occasion, Cox reached inside of her scrub shirt and touched her breast. C.K. testified that she "always let [Cox] know that [she] was uncomfortable with what he was doing." (R. 502.)

C.K. testified that, one time when Cox called her into his office, he was wearing scrubs and she could immediately see that he had an erection. According to C.K., Cox shut and locked the door to his office, pulled his penis out of the scrub pants, and asked C.K. to "touch it," but C.K. refused. (R. 505.) Cox then covered himself and asked her to go into his bathroom. C.K. testified that Cox "had [her] by the arm or the hand and was pulling" her into the bathroom, at which point she asked him what he was doing. (R. 507.) Once inside the bathroom, C.K. said, Cox "put his hands on [her] back and bent [her] over the toilet[,] pulled [her] pants down[,] and started" having sexual intercourse with her. (R. 507.) C.K. quit her job not long after that incident.

Viewing the evidence in a light most favorable to the State, there was more than sufficient evidence from which the jury could have reasonably concluded that Cox subjected C.K. to sexual contact and engaged in sexual intercourse with her by forcible compulsion. With respect to the sexual-abuse charge, Cox used physical force when, while in his private office, he grabbed C.K.'s waist and pulled her to his lap, at which point C.K.'s buttocks, an intimate part, were touching Cox and, on one occasion, Cox touched her breast. With respect to the rape charge,

27

Cox clearly used physical force when he grabbed C.K.'s arm or hand, pulled her into the bathroom, pushed on her back to bend her over the toilet, and then pulled her pants down before engaging in sexual intercourse with her. See, e.g., King v. State, 574 So. 2d 921 (Ala. Crim. App. 1990) (holding that the defendant's pulling the victim's pants down and pushing her hands away as she tried to pull them back up constituted physical force).[7]

Although Cox argues that C.K. "willingly accompanied" him into the bathroom and questions "why [C.K.] followed him into a bathroom," C.K.'s testimony indicates that C.K. did not follow him or willingly accompany him to the bathroom. (Cox's brief, p. 25.) Rather, Cox "pulled" her into the bathroom, forced her to bend over, and pulled down her pants, all of which constituted the use of physical force. In addition, Cox questions "why [C.K.] didn't yell or make any kind of sound while having sex in the bathroom." (Cox's brief, p. 25.) However, C.K. was not

---

[7]King was decided under the former definition of forcible compulsion, and the victim in that case was a child. However, as explained in Part I.A., of this opinion, decisions under the former definition of forcible compulsion, even those involving child victims, are nonetheless instructive as to what constitutes "physical force," a term that remains in the current definition of forcible compulsion.

28

required to yell or make any sound because, as already explained, the current definition of forcible compulsion does not require any resistance on the part of the victim. Because C.K. was not required to yell or resist in any way, it is irrelevant why she did not.

Therefore, the evidence was sufficient to sustain Cox's convictions for rape in the first degree and sexual abuse in the first degree with respect to C.K.

E.

Cox next contends that the State failed to present sufficient evidence of forcible compulsion to sustain his convictions for one count of rape in the first degree, two counts of sodomy in the first degree, and one count of sexual abuse in the first degree with respect to K.H., who worked for Cox as a dental assistant.

K.H. testified that her initial interview with Cox took place in Cox's private office with the door closed and that Cox "kept putting his hand on [her] thigh, and every time he did it, it would last longer." (R. 533.) Cox hired her and asked her to come to the office the Sunday before her first day of work so he could show her around more. During that meeting, K.H. said, Cox convinced her to model a pair of scrub pants for him. K.H.

29

then followed Cox to a nearby store so he could purchase a top for her to wear with the pants. He then asked her to accompany him to his house, and she rode in his vehicle to his house, where he had her wash his boat. K.H. said that, on the way to his house, Cox told her that they "would have to build a relationship that would be comparable to a husband and wife" and that it was her "responsibility to make sure that he was happy and satisfied at all times," both at work and outside of work. (R. 540.)

K.H. testified that on the drive back from his house, Cox grabbed her hand, squeezed it, and interlaced their fingers. Cox also asked K.H. to kiss him on the cheek, and, when she refused, he "got his hand and put it behind [her] head as he was driving and pushed [her] head against his cheek." (R. 550.) She testified that she eventually kissed his cheek so that he would release her. K.H. testified that Cox then asked her to rub his neck and that, when she did not respond, he grabbed her hand and placed it on the back of his neck. As Cox started rubbing her hand over his neck, he "started to groan," which K.H. described as "sexual groans." (R. 551.) After he released her hand, K.H. said, Cox "reached over and he grabbed [her] right breast, and put his hand in my shirt, and started massaging it." (R. 551.) When they arrived back where K.H.'s vehicle

30

was parked, K.H. attempted to get out of Cox's vehicle quickly, but Cox "grabbed [her] and pulled [her] to him and started kissing [her] and put his tongue in [her] mouth." (R. 552.) He also told K.H. that he loved her.

When she started work the next day, K.H. said, Cox acted "[l]ike nothing [had] happened." (R. 554.) However, that lasted only a few days. On Thursday of her first week of work, K.H. noticed that Cox had an erection while working on a female patient, his erect penis "at face level with [the] patient." (R. 555.) Cox became aware that K.H. had seen his erection, and, after finishing with the patient, he ordered K.H. to come to his private office. Cox led her into his office, shut the door, and told her that he wanted her to perform oral sex on him. K.H. refused and tried to leave, but Cox "stuck his arm out and put it on the door so [she] couldn't open it, and then he locked it." (R. 557.) According to K.H., Cox then "put his hands on [her] shoulders and pushed [her] down onto [her] knees," pulled down his pants, "and kept trying to convince [her] to put his penis in [her] mouth," but she refused. (R. 557.) Cox "eventually took his fingers and pried [her] mouth open" and then put his penis in her mouth, using his fingers to keep her mouth open. (R. 557.) With his other hand, Cox "held [her] head there so [she] couldn't move." (R. 557.) After a short

31

time, K.H. said, Cox removed his penis from her mouth and ejaculated into a trash can. Cox then pulled her to a standing position and told her that he wanted to have sex with her. When K.H. refused, Cox "grabbed [her] arm and pulled [her] into the bathroom." (R. 558.) He then turned her around until she was facing the toilet, "bent [her] over," pulled her pants down, and started having sexual intercourse with her. (R. 559.) According to K.H., Cox did not talk to her or acknowledge her much after that incident, although she said that he continued to touch her if she went into his office.

K.H. testified about another incident that started when Cox called her into his office at the end of a workday. K.H. said that she initially stood in the doorway holding the door open, but Cox told her it was important and to close the door, so she stepped into the office and allowed the door to close. Cox then "pulled the waistband of his pants down so that his penis was out, and started telling [K.H.] to give him oral sex again." (R. 563.) K.H. refused and tried to leave, but Cox "grabbed [her] arm" and locked the door, "pulled [her] in front of him directly, put his hands on [her] waist, pulled [her] down to [her] knees again, and started trying to put his penis in [her] mouth." (R. 563.) K.H. said that she

32

refused to open her mouth but that, "eventually, he opened [her] mouth, and put his hand on the back of [her] head and forced his penis into [her] mouth." (R. 563.) K.H. tried to bite Cox, but he told her that he liked that and asked her to bite him harder, so she "[i]mmediately stopped everything." (R. 571.) After Cox ejaculated in her mouth, K.H. fled.

Viewing the evidence in a light most favorable to the State, there was more than sufficient evidence from which the jury could have reasonably concluded that Cox subjected K.H. to sexual contact and engaged in sodomy and sexual intercourse with her by forcible compulsion. With respect to the sexual-abuse charge, Cox clearly used physical force and/or confinement against K.H. Like the term restraint, see Part I.A. of this opinion, the legislature has not defined the term confinement for purposes of forcible compulsion, so we apply "the commonly accepted definition of the term," Lawrence v. State, 389 So. 3d at 1245, bearing in mind that "penal statutes are to be strictly construed" but that "courts are not required to abandon common sense." Ex parte Ankrom, 152 So. 3d at 409. Confinement is defined as "an act of confining" or "the state of being confined." Merriam-Webster's Collegiate

Dictionary at 261. Confine, in turn, is defined as "to hold within a location." Id. at 261.

K.H.'s testimony established that, after spending several hours together at Cox's house the Sunday before she started working for Cox, Cox drove her back to her vehicle. During that drive, while K.H. was confined in a moving vehicle and unable to escape, Cox (1) grabbed K.H.'s head and pulled it toward him until she kissed his cheek, thereby subjecting her to sexual contact when her lips, an intimate part, touched his cheek, and (2) grabbed and massaged K.H.'s breast, thereby subjecting her to sexual contact. In addition, once they arrived where K.H.'s vehicle was parked, K.H. tried to get out of Cox's vehicle, but Cox "grabbed [her] and pulled [her] to him and started kissing [her] and put his tongue in [her] mouth," again subjecting her to sexual contact. (R. 552.) K.H.'s testimony clearly established that Cox used confinement and/or physical force to subject K.H. to sexual contact.

With respect to the two sodomy charges, there was precious plenty evidence indicating that Cox used physical force against K.H. During both incidents, Cox pushed K.H. to her knees, pried her mouth open, and then held her head in place as he placed his penis in her mouth.

34

Finally, with respect to the rape charge, Cox clearly used physical force against K.H. when he grabbed her arm, pulled her into the bathroom, turned her around, bent her over, and pulled her pants down before engaging in sexual intercourse with her.

Therefore, the evidence was sufficient to sustain Cox's convictions for one count of rape in the first degree, two counts of sodomy in the first degree, and one count of sexual abuse in the first degree with respect to K.H.

F.

Cox contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to A.H., a patient of his dental practice.

A.H. testified that, on June 5, 2020, she went to Cox's office to have two crowns placed on her teeth. After the crowns were placed by an assistant, Cox laid her back in the chair to the point where her feet were higher than her head and began to shave the crowns because they felt too big to A.H. After Cox finished, he "started patting" A.H.'s chest (R. 604), then he "pulled [her] shirt up" (R. 604), "touched [her] breasts" (R. 608), and said: "'Those are nice. I bet you have a lot of fun with them.'"

(R. 604.) According to A.H., Cox then offered to give her his telephone number. A.H. reported Cox's actions to police the next day.

Viewing the evidence in a light most favorable to the State, there was sufficient evidence from which the jury could have reasonably concluded that Cox subjected A.H. to sexual contact by forcible compulsion, specifically by his use of confinement and/or restraint. Cox touched A.H.'s breasts when she was undergoing a dental procedure while deeply reclined in a dental chair to the point where her feet were above her head. A.H.'s deeply reclined position left her confined to the chair and restrained because it restricted her movements, rendering her essentially immobilized, and prevented her from escaping, thereby interfering with her liberty. Therefore, the evidence was sufficient to sustain Cox's conviction for sexual abuse in the first degree with respect to A.H.

## G.

Cox also contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to B.B., who worked for Cox as a dental assistant.

36

B.B. testified that, after she completed schooling to become a dental assistant, Cox hired her. She worked for Cox for only three days, when she was 18 years old, and she described three incidents involving Cox during that short time. First, Cox asked her to come to his private office to talk, sat in a chair facing her, and ensured that "he was touching [her] in some kind of way" during the conversation. (R. 633.) B.B. said that Cox "would rub the bottom of [her] leg, he would rub up to the top [of her] leg, [and] if he wanted to show [her] something on the computer, he would rub [her] back." (R. 633-34.) In another incident, B.B. said, she was working in the room where the instruments were sterilized and "he was walking by [her], and he just grabbed [her] butt and kept walking past" her. (R. 635.) B.B. said that she went to lunch after that incident and that, when she returned from lunch visibly upset, Cox asked if she was sick or if she needed anything, and he touched her "forehead and then he moved his hand down to [her] throat." (R. 636.). After B.B. left work that day, she sent a text message to Cox informing him that she was not comfortable working for him and would not be returning to work. In response, Cox sent text messages to B.B. asking her not to "jump the gun

37

too fast" and to come talk to him, and he offered to write her a letter of recommendation. (C. 238.)

B.B. testified to only one incident of sexual contact -- when Cox "grabbed" her buttocks as he walked past her. As noted in Part I.B. of this opinion, although grabbing a person's buttocks is itself forceful, to establish forcible compulsion the State was required to prove that Cox used force beyond that inherent in the sexual contact itself. There was simply no evidence presented indicating that Cox used physical force, violence, confinement, restraint, physical injury, or death beyond the sexual contact itself, nor was there any evidence presented indicating that Cox expressly threatened B.B. with the use of such force. Therefore, we consider whether the evidence was sufficient to establish the existence of an implied threat of physical force, violence, confinement, restraint, physical injury, or death by looking at the factors in § 13A-6-60(1) and the totality of the circumstances.

At the time B.B. worked for Cox, Cox was an adult and much older than B.B., who was 18 years old and still a minor under Alabama law. See § 26-1-1(a), Ala. Code 1975 ("Any person in this state, at the arrival at the age of 19 years, shall be relieved of his or her disabilities of

minority.") The record does not reflect the sizes of Cox and B.B., but the jury was able to observe their respective sizes during trial. In addition, there is no question that Cox, as B.B.'s employer, was in a position of authority over B.B. That being said, the incident occurred in the workplace during working hours, and, although B.B. was in the room where the instruments were sterilized, she said that Cox grabbed her buttocks as he was "walking by" and he then continued walking, thus indicating that Cox did not stop or enter the room. There was no evidence presented indicating that B.B. was under duress or that Cox ever used force against B.B. in any context, and, when she quit, B.B. indicated only that she had been uncomfortable, not that she felt unsafe or scared. Even viewing the evidence in a light most favorable to the State, considering the totality of the circumstances, we have no choice but to conclude that the evidence was insufficient to establish the existence of an implied threat that Cox would use physical force, violence, confinement, restraint, physical injury, or death against B.B. when he grabbed her buttocks as he walked by her.

As with A.J., see Part I.C. of this opinion, although Cox's behavior toward B.B. was reprehensible, it does not rise to the level of the felony

39

offense of sexual abuse in the first degree by forcible compulsion. Therefore, because the State failed to present sufficient evidence of forcible compulsion, we must reverse Cox's conviction for sexual abuse in the first degree with respect to B.B. and render a judgment in his favor. See note 6, supra.

## H.

Last, Cox contends that the State failed to present sufficient evidence of forcible compulsion to sustain his conviction for sexual abuse in the first degree with respect to B.J., who worked for Cox as a dental assistant.

B.J. testified that she worked for Cox two different times, first in 2012 or 2013, and then again in late 2020. B.J. testified that, during her second period of employment in 2020, hugs from Cox were commonplace. According to B.J., the hugs would start as "side hugs" and then turned into full hugs with the front of their bodies touching. (R. 695.) In addition, she testified that, one time when she was in Cox's private office talking about work, B.J. "[t]hought [Cox] was going in for a side hug," but then "he started to pull [her] down to ... sit on him, and [she] resisted." (R. 695.) B.J. said that Cox then pulled her harder and she pulled back

even harder, telling Cox: "No. We're not doing this." (R. 696.) According to B.J., Cox was touching her side as he tried to pull her down. B.J. testified that she left Cox's office after refusing his advances and that, minutes later, Cox told her that she could leave for the rest of the day. When asked if, while working for Cox the second time, "his hands touch[ed her] breasts, behind, anything like that," B.J. said "[m]y behind, yes." (R. 696.) B.J., however, did not describe the circumstances of that sexual contact.

While she was off work during the holidays in December 2020, B.J. sent a text message to Cox telling him that he had put her in an "awkward position" and that she would not be returning to work. (C. 240.) In response, Cox sent a text message to B.J., stating:

> "I didn't think a hug was too much to ask for the sacrifice I have made for you. Maybe show you cared a little for all the efforts I have made. Sorry EXTREMELY selfish and unappreciative on your part. Grow up."

(C. 240.) B.J. responded, stating, in relevant part: "Wow! I don't think I would ever make a big deal about a hug! But that's not all it was." (C. 240.) Approximately two months later, Cox sent a text message to B.J. stating, in relevant part: "I'm sorry I made you feel uncomfortable that

41

day. I really think I was just too happy to have you back at the office[.]" (C. 244.)

The only sexual contact B.J. testified about was when Cox touched her buttocks. B.J., however, provided no details about that incident. There was simply no evidence presented indicating that Cox used physical force, violence, confinement, restraint, physical injury, or death beyond the sexual contact itself or that Cox expressly threatened B.J. with the use of such force. Therefore, we consider whether the evidence was sufficient to establish the existence of an implied threat of physical force, violence, confinement, restraint, physical injury, or death by looking at the factors in § 13A-6-60(1) and the totality of the circumstances.

Both Cox and B.J. were adults and the incident occurred in the workplace during working hours, but there is no question that Cox, as B.J.'s employer, was in a position of authority over B.J. Although the record does not reflect the sizes of Cox and B.J., the jury was able to observe their respective sizes during trial. In addition, B.J. testified about an incident in which Cox did use physical force against her by trying to pull her to his lap while they were in his private office, although

42

no sexual contact occurred during that incident. However, B.J. did not indicate in her testimony when that incident of force occurred in relation to Cox's touching her buttocks, and she said that Cox's behavior made her feel awkward, not unsafe or scared. Even viewing the evidence in a light most favorable to the State, considering the totality of the circumstances, we have no choice but to conclude that the evidence was insufficient to establish the existence of an implied threat that Cox would use physical force, violence, confinement, restraint, physical injury, or death against B.J. when he touched her buttocks.

As with A.J. and B.B., see Parts I.C. and I.G. of this opinion, although Cox's behavior toward B.J. was reprehensible, it does not rise to the level of the felony offense of sexual abuse in the first degree by forcible compulsion. Therefore, because the State failed to present sufficient evidence of forcible compulsion, we must reverse Cox's conviction and sentence for sexual abuse in the first degree with respect to B.J. and render a judgment in his favor. See note 6, supra.

II.

Cox next contends on appeal that the trial court erred in not removing juror A.K. from the jury after, he said, she committed misconduct.

The record reflects that, after a lunch break during the testimony of the State's first witness, juror D.H. informed the trial court that, before opening statements, she had overheard another juror state "that she had already made her mind up, she knew how she was going to vote," although the juror did not specifically state how she was going to vote. (R. 343.) The trial court informed the parties and, after much discussion and questioning D.H., the court and the parties were able to identify the juror who allegedly made the statement as juror A.K. Upon further discussion, the trial court then questioned A.K. about the alleged statement she made. A.K. said that she did not "remember that exact statement" (R. 366) and "honestly [did not] recall that" (R. 367), but she said that, in responding to another juror's statement, she had stated: "I believe it seemed kind of obvious." (R. 366.) When asked if she could "keep an open mind and listen to all of the testimony and not form an opinion about the case until [she] heard all of the evidence and the Court has charged you," A.K. replied in the affirmative. (R. 370.) She also

44

stated that she had not, in fact, made up her mind about the case. The trial court left A.K. on the jury.

At no point during the above proceedings did Cox request that juror A.K. be removed from the jury or object in any manner to the trial court's handling of the situation. Rather, Cox waited until after he was convicted and sentenced and then raised a claim of juror misconduct in his motion for a new trial. "Grounds urged in a motion for a new trial must ordinarily have been preserved at trial by timely and sufficient objections." Williams v. State, 710 So. 2d 1276, 1311 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997). "Timely objections must be made to preserve an assignment of error for appellate review, and the objection should be made as soon as the objectionable ground becomes apparent." Perkins v. State, 715 So. 2d 888, 894 (Ala. Crim. App. 1997). Because Cox failed to request that juror A.K. be removed from the jury or otherwise object to the trial court's actions at the time he was made aware of juror A.K.'s alleged misconduct, this issue was not properly preserved for review.

Moreover,

"to allow [the] defendant to complain of error at a later time would give him the opportunity to be aware of the error, but

45

to remain silent, speculate on a favorable verdict, and in the event of an unfavorable verdict to obtain reversal on a ground which defendant deliberately chose not to raise by exception taken at the appointed time."

Fuller v. State, 365 So. 2d 1010, 1012 (Ala. Crim. App. 1978). "'Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.'" Jackson v. State, 620 So. 2d 147, 148 (Ala. Crim. App. 1993) (quoting Phillips v. State, 527 So. 2d 154, 156 (Ala. 1988)). Any error in the trial court's not removing juror A.K. from the jury was invited by Cox himself and does not entitle Cox to relief.

## III.

Cox also contends that the trial court erred in granting the State's motion to consolidate for trial the three indictments against him.

As noted above, the indictments in cases no. CC-21-1877 and CC-21-1878 each contained a single count of sexual abuse in the first degree. The remaining 13 charges for which Cox was tried, involving 11 different women, were contained in a single indictment in case no. CC-22-154. In its motion to consolidate the indictments, the State argued that the offenses in the three indictments were "of the same or similar character," were "based on the same conduct, or [were] otherwise connected in their

46

commission," were "alleged to have been part of a common scheme or plan," and were "so similarly situated that evidence of ... one case would be admissible in the trial of the other case." (C. 24.) At the hearing on the State's motion, Cox objected to consolidating the three indictments, arguing that consolidation would be "more prejudicial than probative." (R. 10.) Cox initially requested that all the charges be severed from each other, but he then stated that he wanted the sexual-abuse charges severed from the rape and sodomy charges. Cox maintained the "parad[ing] a bunch of women in front of [the jury] and pil[ing] them all on to convict him of those two rape[ and sodomy charges] would be inappropriate." (R. 14.) The trial court granted the State's motion to consolidate.

On appeal, Cox argues that he suffered actual and compelling prejudice from the consolidation of the indictments based on the "sheer number" of victims. (Cox's brief, p. 42.) Cox points to a prospective juror who indicated during voir dire that the fact that someone has been arrested and accused of "that many" crimes indicates probable guilt and to juror A.K.'s statement that "it seemed kind of obvious" as evidence

indicating that he was prejudiced by having a single trial involving multiple charges and victims.  (Cox's brief, pp. 41-42.)

Rule 13.3(c), Ala. R. Crim. P., provides, in relevant part:

"If offenses … are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together … if the offenses … could have been joined in a single indictment, information, or complaint. Proceedings thereafter shall be the same as if the prosecution initially were under a single indictment, information, or complaint.  However, the court shall not order that the offenses … be tried together without first providing the defendant ... and the prosecutor an opportunity to be heard."

Rule 13.3(a), Ala. R. Crim. P., provides that:

"Two or more offenses may be joined in an indictment, information, or complaint, if they:

"(1) Are of the same or similar character; or

"(2) Are based on the same conduct or are otherwise connected in their commission; or

"(3) Are alleged to have been part of a common scheme or plan."

"'"'"Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness."'"'"  Hinkle v. State, 86 So. 3d 441, 446 (Ala. Crim. App. 2011) (citations omitted).  "Moreover, '[a] trial

48

court is vested with substantial discretion in deciding whether to consolidate cases, and its decision as to consolidation will be reversed only for a clear abuse of that discretion.'" Bester v. State, 381 So. 3d 1155, 1164 (Ala. Crim. App. 2022) (quoting Hinkle, 86 So. 3d at 446). Notably, this Court "has upheld the consolidation of cases involving rape and sexual abuse." Bester, 381 So. 3d at 1165 (footnote omitted).

Here, all the offenses in the three indictments were felony sex offenses that had a common element -- forcible compulsion -- and similar victims -- either patients or employees of Cox's dental practice. The offenses were similar in character, and they were alleged to have been part of a common scheme or plan by Cox to use his dental practice to prey on women in vulnerable positions. More importantly, contrary to Cox's argument, "'[n]o prejudice results where, as here, the jury could easily separate the evidence of the separate crimes.'" Bester, 381 So. 3d at 1166 (quoting Summerlin v. State, 594 So. 2d 235, 236-37 (Ala. Crim. App. 1991)). As noted above, the jury acquitted Cox of three counts of sexual abuse in the first degree involving three different women, thus clearly indicating that it was able to separate the evidence and consider each charge individually.

49

Therefore, the trial court did not err in granting the State's motion to consolidate the three indictments.

IV.

Cox contends that the trial court erred in admitting into evidence "a portion of a text message between [S.T.] and Dr. Cox, without providing the full conversation." (Cox's brief, p. 43.) Under the doctrine of completeness, Cox argues, the entire text conversation had to be admitted and admitting only a portion of that conversation constituted reversible error.

During S.T.'s testimony, the State introduced into evidence State's Exhibit 1, a printout of the text messages Cox sent to S.T. after S.T. had texted him and told him that she was quitting her job. S.T. testified that, other than the text message she sent quitting her job, the only time she texted Cox was if she was unable to come to work for whatever reason, which, she said, rarely happened. S.T. also testified that she had not deleted any of the text messages she had received from Cox in response to her message about quitting her job and that she had not replied to any of them. The exhibit did not include S.T.'s original text sent to Cox when quitting her job, only Cox's text messages sent in response, although S.T.

testified to what she had said in her initial text message. Cox's counsel objected on the ground that the exhibit was only "a portion of the recording," stating that if Cox and S.T. "communicated, I want all of the communication, instead of what was selected by the State." (R. 422.) The trial court overruled Cox's objection and admitted the exhibit. The State later recalled S.T. and introduced into evidence State's Exhibit 2, a copy of the text message S.T. had initially sent to Cox quitting her job. Cox again objected, stating: "I don't know that that's all the text messages in -- between them." (R. 489.)

At the time of Cox's trial, Rule 106, Ala. R. Evid., provided that, "[w]hen a party introduces part of either a writing or recorded statement, an adverse party may require the introduction at that time of any other part of the writing or statement that ought in fairness to be considered contemporaneously with it."[8] "By its very terms, the doctrine of completeness relates only to matters contained in a single conversation." Dawson v. State, 675 So. 2d 897, 905 (Ala. Crim. App. 1995) (opinion on

---

[8]Effective July 15, 2024, Rule 106 was amended to read: "If a party introduces part of any statement, an adverse party may require the introduction at that time of any other part of the statement that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection."

51

application for rehearing), aff'd, 675 So. 2d 905 (Ala. 1996). See also Johnson v. State, 823 So. 2d 1, 39 (Ala. Crim. App. 2001) ("[T]he doctrine of completeness does not extend beyond a single conversation.").

To the extent that the trial court allowed, over Cox's objection, the State to introduce into evidence State's Exhibit 1 by itself without State's Exhibit 2, that ruling was error because State's Exhibit 1 did not include the complete conversation between S.T. and Cox. Because the whole of the conversation was not included in the exhibit, Cox had the right under Rule 106 to require the admission into evidence of the entire conversation at the time State's Exhibit 1 was admitted into evidence.

That being said, the trial court's error was essentially cured when the State recalled S.T. and introduced into evidence State's Exhibit 2, a copy of the initial message S.T. sent to Cox quitting her job. "The doctrine of completeness 'serves the purpose of allowing a party to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary.'" DeBlase v. State, 294 So. 3d 154, 217 (Ala. Crim. App. 2018) (quoting Ex parte Tucker, 474 So. 2d 134, 135 (Ala. 1985)). By recalling S.T. and introducing into evidence State's Exhibit 2, the State ultimately

satisfied the purpose of the doctrine of completeness and rendered harmless the error in the admitting State's Exhibit 1. See Rule 45, Ala. R. App. P. ("No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."). To the extent that Cox alleged at trial, and posits on appeal, that State's Exhibits 1 and 2 may not be the complete text exchange between S.T. and Cox when S.T. quit her job, that argument is belied by the record. S.T.'s testimony makes it clear that the two exhibits include the entire text exchange between herself and Cox on the day she quit her job and that the only other text exchanges between them were part of different conversations.

Therefore, although the trial court erred in admitting into evidence State's Exhibit 1 by itself, that error was cured and rendered harmless

53

by the subsequent admission of State's Exhibit 2. Therefore, Cox is due no relief on this claim.

V.

Finally, Cox contends that his consecutive sentences totaling 180 years' imprisonment violate the Eighth Amendment to the United States Constitution. He argues, as he did in his motion for a new trial, that such a lengthy term of confinement constitutes cruel and unusual punishment and is grossly excessive and disproportionate to his crimes. We note that, because we are reversing three of Cox's convictions for sexual abuse in the first degree, for which he received sentences of 10 years' imprisonment each, the total of his sentences is now 150 years' imprisonment.

Rape in the first degree and sodomy in the first degree are both Class A felonies, see §§ 13A-6-61(b) and 13A-6-63(b), Ala. Code 1975, that, at the time of the crimes,[9] were punishable "for life or not more than 99 years or less than 10 years" in prison. Former § 13A-5-6(a)(1), Ala. Code 1975 (version in effect at the time of the crimes). Sexual abuse in

_____

[9]Generally, "[a] defendant's sentence is determined by the law in effect at the time of the commission of the offense." Davis v. State, 571 So. 2d 1287, 1289 (Ala. Crim. App. 1990).

54

the first degree is a Class C felony, see § 13A-6-66(b), Ala. Code 1975, that, at the time of the crimes, was punishable by "not more than 10 years or less than 1 year and 1 day" in prison. Former § 13A-5-6(a)(3), Ala. Code 1975 (version in effect at the time of the crimes). Cox's sentences of 25 years' imprisonment for each of the rape and sodomy convictions and 10 years' imprisonment for each of the sexual-abuse convictions were within the statutory range of punishment.

> "It is well settled that '[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion.' Alderman v. State, 615 So. 2d 640, 649 (Ala. Crim. App. 1992). 'The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights." ' Brown [v. State, 611 So. 2d 1194], 1197 n.6 [(Ala. Crim. App. 1992)], quoting Ex parte Maddox, 502 So. 2d 786, 789 (Ala. 1986)."

Adams v. State, 815 So. 2d 583, 585 (Ala. Crim. App. 2001).

In determining the proportionality of a sentence, we consider the gravity and circumstances of the crime, the harshness of the punishment, the harm caused to the victim or to society, the culpability of the offender, and the offender's motive. See, e.g., Jackson v. State, [Ms. CR-2023-0170, June 27, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025), and the cases

cited therein. Considering those factors, we have no trouble concluding that Cox's consecutive sentences totaling 150 years' imprisonment for multiple felony sex offenses are not so disproportionate as to violate the Eighth Amendment. See, e.g., Wolfe v. State, [Ms. CR-2023-0871, June 28, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024) (holding that consecutive sentences totaling 180 years' imprisonment for multiple felony sex offenses does not violate the Eighth Amendment), and the cases cited therein.

## VI.

Based on the foregoing, we affirm Cox's conviction and sentence in case no. CC-21-1877 for sexual abuse in the first degree with respect to A.H.; his conviction and sentence in case no. CC-21-1878 for sexual abuse in the first degree with respect to S.T.; and his convictions and sentences in case no. CC-22-154 for one count of rape in the first degree, two counts of sodomy in the first degree, and one count of sexual abuse in the first degree with respect to K.H., one count of rape in the first degree and one count of sexual abuse in the first degree with respect to C.K., and one count of sexual abuse in the first degree with respect to A.P. We reverse Cox's convictions and sentences in case no. CC-22-154 for one count of

sexual abuse in the first degree with respect to A.J., one count of sexual abuse in the first degree with respect to B.B., and one count of sexual abuse in the first degree with respect to B.J. and render judgments on those counts in Cox's favor.

AFFIRMED IN PART; REVERSED AND JUDGMENT RENDERED IN PART.

Kellum, J., concurs in the result. Windom, P.J., concurs in part and dissents in part, with opinion, which Minor, J., joins. Cole, J., concurs in part and dissents in part, with opinion. Anderson, J., concurs in part, concurs in the result in part, and dissents in part, with opinion.

WINDOM, Presiding Judge, concurring in part and dissenting in part.

I concur with the main opinion in all parts except for Part I.C. As to that part, I respectfully dissent.

I agree with the main opinion's holding that "[a] hug, even if unwanted, does not rise to the level of physical force, violence, confinement, restraint, physical injury, or death." ___ So. 3d at ___. I disagree, though, that Cox's transgression against A.J. involved a mere hug. A.J. testified:

> "My very first day, he called me in his office, and gave me a big ole hug, and … when he -- when we were releasing our hug, he brought me back in really quick, and he slapped me on the butt three times, and it wasn't, like, (demonstrating) a little pat. Like, my skin popped."

(R. 448-49.)

Here, the State offered evidence indicating that the hug had concluded -- A.J. and Joseph Clarence Cox were "releasing" their hug. Cox then "brought [A.J.] back in really quick [and] slapped [her] on the butt three times." (R. 449.) I believe Cox's pulling A.J. back in "really quick" was sufficient evidence for the jury to reasonably conclude that Cox used physical force against A.J. to facilitate his sexual contact of her.

58

I would affirm Cox's conviction for first-degree sexual abuse against A.J. Therefore, I respectfully dissent from that portion of the main opinion.

Minor, J., concurs.

COLE, Judge, concurring in part and dissenting in part.

I concur with the main opinion in all parts, except for Part I.A., from which I respectfully dissent.

ANDERSON, Judge, concurring in part, concurring in the result in part, and dissenting in part.

I concur with the main opinion, with the exception of Part I.A., from which I dissent, and Parts I.B., I.C., and I.G., with which I concur in the result. I write specially to address Parts I.A. and I.B. and the difficulties presented by this case.

## Part I.A.

With respect to Joseph Clarence Cox's conviction for first-degree sexual abuse as to A.P., A.P. testified that, although she never verbally consented to Cox's behavior, she believed that "probably by me smiling or laughing or kind of brushing it off … he felt like he could go further and further and further." (R. 316-17.) During cross-examination, A.P. admitted that she did not think Cox would attack her or become "physical" or "violent" with her during their encounters. (R. 335, 338.) Instead, she was afraid she would lose her job. (R. 338.)

While other parts of A.P.'s testimony established that she did not consent to Cox's actions, at no point in her testimony did A.P. describe any threats of violence, use of restraint or confinement, or other circumstances traditionally constituting forcible compulsion. Consequently, the main opinion correctly focuses on whether physical

61

"force" was employed against A.P. Part I.A. of the main opinion affirms Cox's conviction for first-degree sexual abuse against A.P. by finding that the State's evidence was sufficient to prove that Cox subjected A.P. to sexual contact by forcible compulsion in two different ways. First, the main opinion concludes that Cox used "physical force" when he "gripped A.P.'s arm and pulled her onto his lap …." ___ So. 3d at ___.

In reaching that conclusion, however, the main opinion relies on cases predating the Legislature's 2019 amendment of § 13A-6-60, Ala. Code 1975, which removed any requirement that proof of "earnest resistance" be offered to establish the element of "forcible compulsion." Thus, in each of the cases the main opinion relies on, this Court was applying a definition of "forcible compulsion" that required the State to prove that a defendant employed "[p]hysical force that overcomes earnest resistance." See, e.g., S.M.B. v. State, 348 So. 3d 438, 450 (Ala. Crim. App. 2021). In light of former § 13A-6-60's language, the precise contours of what constituted "physical force" did not require exploration because that term was modified by the subsequent phrase "that overcomes earnest resistance." In other words, the force employed had to be of such a character that it was sufficient to overcome the victim's lack of consent

62

and resistance to the perpetrator's actions. Consequently, the focus in such cases was not on the nature of the "physical force" employed. For instance, in <u>A.B.T. v. State</u>, 620 So. 2d 120, 122 (Ala. Crim. App. 1992), the evidence showed that the defendant "gripped" the victim by the arm and kept her from getting away while he groped her. This Court saw no need to discuss whether or how that "gripping" amounted to "physical force," instead concluding simply that "[t]here was a gracious plenty of evidence that the sexual contact was by forcible compulsion." <u>Id.</u>

Today, though, this Court faces a more difficult task: determining precisely what the Legislature intended the term "physical force" to mean, as that term is used in the statute as amended. The difficulty in this task comes from the fact that when the Legislature amended § 13A-6-60, it also amended § 13A-6-65 and § 13A-6-66, Ala. Code 1975, which address, respectively, the misdemeanor offense of sexual misconduct and the Class C felony of sexual abuse in the first degree. Section 13A-6-65 criminalizes sexual contact that is nonconsensual but, unlike § 13A-6-66, <u>does not</u> require the element of "forcible compulsion." Logically, then, the State must prove <u>something</u> more than a defendant's simple physical action constituting sexual contact in order to elevate an offense from

63

sexual misconduct to sexual abuse. Antonin Scalia & Bryan A. Garner, Reading Law: Interpretation of Legal Texts 176 (Thomson/West 2012) ("If a provision is susceptible of (1) a meaning that ... deprives another provision of all independent effect[ ] and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.")

The main opinion appears to recognize this and attempts to craft a workable rule by holding -- in Part I.B. -- that "nonconsensual sexual contact that involves only the force inherent in the sexual contact itself does not establish forcible compulsion." ___ So. 3d at ___. Unfortunately, that pronouncement conflicts with the main opinion's conclusion in Part I.A., and it underscores why the main opinion's reliance on preamendment cases is misplaced. When Cox pulled A.P. onto his lap, the physical action that he took -- pulling her onto his lap -- was inherent in the sexual contact (i.e., that action caused "A.P.'s buttocks, an intimate part, [to] touch[] Cox"). ___ So. 3d at ___. The main opinion does not attempt to explain how this action differs from Cox's grabbing S.T. between her legs – an act discussed in Part I.B. -- which it holds did not constitute "physical force" for the purpose of showing forcible compulsion.

At bottom, I believe the main opinion errs by reading § 13A-6-60(1) as though the Legislature had used the term "physical <u>action</u>" instead of "physical <u>force</u>." To be sure, physical action happens every time someone engages in a "touching" that amounts to "sexual contact" as that latter term is defined by § 13A-6-60(3). But the Legislature did not define forcible compulsion as "touching" or "physical action." Instead, it defined it as requiring physical <u>force</u>, without defining physical <u>force</u>.

As the main opinion correctly points out, "'"'when a term is not defined in a statute, the commonly accepted definition of the term should be applied.'"'" <u>Lawrence v. State</u>, 389 So. 3d 1237, 1245 (Ala. Crim. App. 2023) (citations omitted). Consider, then, that among the definitions of "force" is "violence, compulsion, or constraint exerted upon or against a person or thing." <u>Merriam-Webster's Collegiate Dictionary</u> 489 (11th ed. 2020). As a verb, force is defined as "to achieve or win by strength in struggle or violence" and "to press, drive, pass, or effect against resistance or inertia." <u>Id.</u>

Considering these definitions for what constitutes "physical force," I cannot agree that A.P.'s testimony that Cox "would ask me to sit in his lap or he would pull my arm and pull me into his lap" -- especially when

considered in the context of A.P.'s testimony that she was not afraid of violence or physicality from Cox -- amounted to "physical force" as that term is used in § 13A-6-60(1)'s definition of "forcible compulsion." While the State no longer bears any burden of proving that a defendant's use of physical force overcame a victim's "earnest resistance," the Legislature's decision to retain the term "physical force" must be given meaningful effect and must take into account the Legislature's retention of the criminal offense of sexual misconduct. Ex parte C.M., 411 So. 3d 368, 376 (Ala. Crim. App. 2024) (observing that rules of statutory construction do not permit an interpretation that leaves a word "meaningless or superfluous"). Considering the Legislature's retention of the term "physical force" in conjunction with the terms it added -- i.e., "violence, confinement, restraint, physical injury, or death" -- a clear indication of the character and types of physical actions contemplated as forcible compulsion emerges. In my view, the evidence regarding Cox's pulling A.P. into his lap does not rise to that level.

Second, the main opinion holds that Cox used physical force amounting to forcible compulsion when he "wrapped his arms around A.P. and rubbed his penis against her leg." ___ So. 3d at ___. However,

A.P.'s testimony was that Cox rubbed his penis against her during a hug. There was no testimony that the hug actually "prevent[ed A.P.] from doing" anything or otherwise kept her "under [Cox's] control." See Merriam-Webster's Collegiate Dictionary at 1063 (defining "restrain"). Similarly, there was no testimony that Cox's hug was violent or that A.P. felt restrained by the hug. Nor does the main opinion offer any explanation as to why Cox's hugging A.P. amounted to "forcible compulsion" when it holds, with regard to A.J. in Part I.C., that a "hug, even if unwanted, does not rise to the level of physical force, violence, confinement, restraint, physical injury, or death." ___ So. 3d at ___.

For these reasons, I would reverse Cox's first-degree sexual abuse conviction with regard to A.P. However, this does not mean that Cox's behavior was not criminal, much less that it was not deplorable. As discussed above, the crime of sexual misconduct criminalizes sexual contact that is carried out without another's consent. § 13A-6-65 (making criminal "sexual contact with another person without his or her consent under circumstances other than those under" first-degree sexual abuse, second-degree sexual abuse, and sexual abuse of a child under the age of 12).

67

In <u>Lucas v. State</u>, 204 So. 3d 929 (Ala. Crim. App. 2016), this Court found the evidence insufficient to support a finding that Lucas had engaged in attempted first-degree sodomy with his victim because no evidence established the required element of forcible compulsion. Because the jury in that case had been instructed on the lesser-included offense of attempted sexual misconduct, however, we remanded the case with instructions for the trial court to enter a judgment finding Lucas guilty of that offense. <u>Id.</u> at 938. That procedure is unavailable to the Court here, however, because the Etowah Circuit Court refused to instruct the jury on the lesser-included offense of sexual misconduct and neither the State nor Cox objected to that decision. (R. 674-75, 859); <u>Ex parte Roberts</u>, 662 So. 2d 229, 232 (Ala. 1995) (holding that remanding for entry of judgment of conviction on lesser-included offense requires that "the jury [be] charged on the lesser included offense").

For these reasons, I must respectfully dissent from the main opinion as to Part I.A.

## Part I.B.

With respect to Cox's conviction for sexual abuse in the first degree as to S.T., I concur in the result reached in the main opinion, but I cannot

adopt or accept its reasoning. The main opinion concludes that Cox's sexual contact with S.T. came about by the use of an "implied threat … that he would use physical force, violence, confinement, restraint, physical injury or death against S.T." ___ So. 3d at ___. But under the reasoning provided in Part I.B. of the main opinion, forcible compulsion requires evidence that the criminal sexual contact was accomplished <u>by</u> the implied threat -- that is to say, that it could not have been carried out <u>but for</u> that threat. Cox's sexual contact with S.T., however, occurred by <u>surprise</u>, and no threat -- overt or implied -- was necessary to accomplish it. The main opinion offers no explanation for its change in approach to the analysis of forcible compulsion, and I cannot agree with its reasoning. The inconsistency created by the main opinion's treatment of S.T. provides no answers to the litigants in this case; nor will it provide useful assistance or instruction to lower courts or practitioners of the law for use in future cases.

I do agree, however, that sufficient evidence was presented to show that Cox's sexual contact with S.T. <u>was</u> the result of forcible compulsion. The question, as I see it, is whether Cox's physical action effectively compelled S.T. to suffer unwanted sexual contact. As discussed above, the

69

definition of "force" includes "compulsion … exerted upon or against a person." Merriam-Webster's Collegiate Dictionary at 489. "Compel," in turn, is defined as "to drive or urge forcefully or irresistibly," id. at 253 (emphasis added), thus carrying with it a sense of an action sufficient to overcome any resistance or lack of consent on the victim's part.

The facts before this Court show that, only the day before Cox grabbed her, S.T. told Cox in no uncertain terms that she did not consent to his attempts at sexual contact. The record also shows that, after his initial advances were rebuffed, Cox deliberately took action to overcome her refusal to consent by "ambushing" her from behind the following day. Thus, in this case, the physical action Cox used to accomplish the sexual contact -- the forceful grab from behind -- was also overtly calculated to achieve something more than the sexual contact. Indeed, the State's evidence established that Cox used the element of surprise to make his actions "irresistible" in the face of S.T.'s previously communicated withholding of consent. Under the particular circumstances that exist here, I believe that Cox's physical actions against S.T. equated to physical force calculated to overcome her ability to further resist his abhorrent

behavior due to the added element of surprise, and, for that reason, I concur in the result of the main opinion as to Part I.B.[10]

_____

[10]Not every "surprise grab" constitutes sexual abuse in the first degree. But the facts and law applicable here distinguish this case from other cases in which "surprise" was employed by an abuser to give a "fleeting grope" before a victim could react. See, e.g., Price v. Haney, 562 F. App'x 334, 337 (6th Cir. 2014) (explaining that "a fleeting grope evinces no showing of compulsion because the element of surprise obviates the need to overcome a victim's resistance").